# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 35974

| | | |
|---|---|---|
| STUART MACKAY, | ) | |
| | ) | **Boise, April 2011 Term** |
| Plaintiff-Respondent, | ) | |
| | ) | **2011 Opinion No. 86** |
| v. | ) | |
| | ) | **Filed: July 28, 2011** |
| FOUR RIVERS PACKING CO., | ) | |
| | ) | **Stephen Kenyon, Clerk** |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the Third Judicial District of the State of Idaho, Washington County. Hon. Stephen W. Drescher, District Judge.

The judgment entered upon the jury's verdict is affirmed.

Birch Law Office, Chtd., Payette, for appellant. Bruce H. Birch argued.

Johnson & Monteleone, L.L.P., Boise, for respondent. D. Samuel Johnson argued.

_____

HORTON, Justice.

This is an appeal from a judgment entered upon a jury verdict in favor of Stuart Mackay (Mackay) against Four Rivers Packing Co. (Four Rivers), finding that Four Rivers breached a contract for long-term employment. Four Rivers' appeal challenges the sufficiency of the evidence to support the jury verdict, the adequacy of the trial court's jury instructions regarding contract formation, and the trial court's failure to instruct the jury regarding the statute of frauds. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Four Rivers operates an onion packing plant near Weiser, Idaho that began business in 1999. In August of that year, Four Rivers' general manager, Randy Smith (Smith), suggested that Four Rivers hire Mackay as the company's field man. Mackay had been in the onion business for decades and knew many onion farmers near Weiser. Four Rivers authorized Smith to offer Mackay the position, but required Smith to personally pay Mackay's wages during

1

Mackay's first year. As field man, Mackay was responsible for purchasing enough onions to keep Four Rivers' packing shed stocked through mid-March, at a price Smith would set.

The parties dispute facts regarding the contract at the center of this appeal. Mackay alleges that in March of 2000, Smith orally offered him a long-term employment contract. Mackay alleges he discussed the offer with his wife and accepted the offer the following day. According to Mackay, the parties intended the employment contract to continue until Mackay chose to retire. Mackay claims he informed Smith he might not retire for as long as ten years. Smith denies ever having any conversation with Mackay about a long-term employment contract.

During the 1999-2000 season, Smith and Mackay both procured onions for Four Rivers' shed. Mackay was able to purchase onions at prices specified by Smith, and the shed remained stocked until April, with Four Rivers packing a total 800,000 bags of onions that year. Meanwhile, Four Rivers experienced financial and managerial hardship. As the result of a dispute between the owners, on June 2, 2000, an injunction stopped all Four Rivers' business. Mackay and other employees were laid off. Mackay alleges that, during the time that the injunction remained in effect, Four Rivers asked him to maintain contact with farmers in order to reassure them that Four Rivers would return to normal business and perform on its existing contracts. Mackay claims he agreed to do so because he wanted to protect his interest in long-term employment. Four Rivers denies it made any such request. The injunction was lifted in mid-August 2000. Four Rivers rehired Mackay and relieved Smith of responsibility for paying Mackay's wages.

In subsequent seasons, Mackay experienced difficulty purchasing onions at the prices specified by Smith. During the 2000-2001 packing season, Four Rivers gave Mackay a contact list for over two hundred onion farmers and instructed him to build more business relationships. Smith contends Mackay failed to do so, and merely maintained his earlier relationships with farmers in the Weiser area. That season, Four Rivers packed approximately 400,000 bags of onions. Witnesses for both Mackay and Four Rivers acknowledged that the injunction in 2000 adversely affected the number of contracts Four Rivers obtained in advance of the 2000-2001 season.

In October of 2001, Four Rivers drafted a written employment contract at Mackay's request. The proposed contract contained an at-will provision that permitted Four Rivers to

terminate Mackay's employment upon fourteen days' notice. Although Mackay made several handwritten notations on the contract, neither party signed the document.

Smith testified that Mackay's performance remained unsatisfactory during the 2001-2002 season. Smith testified that he met with Mackay twice to explain that if Mackay did not obtain enough onions to meet Four Rivers' needs, everyone at Four Rivers would lose their jobs. Memoranda subsequently were entered in Mackay's employment file to document that Mackay was informed that his performance was unsatisfactory and that he would lose his job if he did not obtain more onions. After the meetings, Mackay's travel log reflected a decrease in his travel, which Four Rivers contends indicates he failed to meet these expectations. However, Mackay testified that in response to Smith's urgings, he increased his efforts and even worked thirty-six days straight.

In 2003, Four Rivers once again struggled to keep the onion sheds stocked. As a consequence, Four Rivers closed its shed in mid-February, one month earlier than planned. On March 7, 2003, Four Rivers laid Mackay off, and Mackay obtained unemployment benefits. Smith testified that in June 2003, Mackay rejected Four Rivers' offer of employment as an outside foreman. Mackay denied Four Rivers made any such offer.

Mackay filed suit in August of 2004, alleging breach of contract. The district court initially granted Four Rivers' motion for summary judgment, holding that because the employment agreement could not be performed by its terms within one year, it violated the statute of frauds. Mackay appealed, and in *Mackay v. Four Rivers Packing Co.*, 145 Idaho 408, 179 P.3d 1064 (2008) (*Mackay I*), we vacated the grant of summary judgment, holding that there was a genuine issue of material fact as to the duration of the alleged agreement. This Court also held, taking "as true Mackay's allegation that the contract was to last 'until retirement,'" the contract would fall outside the statute of frauds because "Mackay could have retired within one year under the terms of the alleged contract . . . ." *Id*. at 412, 179 P.3d at 1068.

At trial following remand, Four Rivers contended that the parties had not entered into an employment contract for any specified term. Four Rivers objected to a jury instruction given by the court because it suggested that the parties had reached an agreement as to at least some terms of an employment contract. Four Rivers also objected to the district court's failure to provide the jury with an instruction on the statute of frauds. The district court overruled Four Rivers' objections.

3

The jury returned a verdict in favor of Mackay. In its answers to the questions presented in the special verdict form, the jury found that the parties had entered "into a long term employment contract of up to ten years, or such time as the Plaintiff retired." Four Rivers timely appealed, challenging the jury instructions and the sufficiency of the evidence.

## II. STANDARD OF REVIEW

"The propriety of jury instructions is a question of law over which this Court exercises free review, and the standard of review of whether a jury instruction should or should not have been given is whether there is evidence at trial to support the instruction, and whether the instruction is a correct statement of the law." *Clark v. Klein*, 137 Idaho 154, 156, 45 P.3d 810, 812 (2002) (internal citations omitted). This Court reviews jury instructions as a whole to determine whether the instructions fairly and adequately present the issues and state the law. *Silver Creek Computers, Inc. v. Petra, Inc.*, 136 Idaho 879, 882, 42 P.3d 672, 675 (2002). Even where an instruction is erroneous, the error is not reversible unless the jury instructions taken as a whole mislead or prejudice a party. *Id.* Likewise, a special verdict form does not constitute reversible error unless it incorrectly instructed the jury as to the law or its form was confusing. *VFP VC v. Dakota Co.*, 141 Idaho 326, 332, 109 P.3d 714, 720 (2005) (citing *Le'Gall v. Lewis Cnty.*, 129 Idaho 182, 185, 923 P.2d 427, 430 (1996)).

"On appeal from a judgment entered on a jury verdict, this Court will not set aside the verdict if it is supported by substantial and competent evidence." *Stoddard v. Nelson*, 99 Idaho 293, 296, 581 P.2d 339, 342 (1978). The evidence supporting the jury's verdict may be contradicted, but the verdict will be upheld if it is "of such sufficient quantity and probative value that reasonable minds could conclude that the verdict of the jury was proper." *Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 736, 518 P.2d 1194, 1198 (1974). This Court will not second guess the jury's determinations as to the weight of the evidence and witness credibility. *McKim v. Horner*, 143 Idaho 568, 572, 149 P.3d 843, 847 (2006).

## III. ANALYSIS

We first consider Four Rivers' claims that the district court erred by instructing the jury in a manner that infringed on the fact-finding role of the jury and by failing to instruct the jury as to the statute of frauds. We then consider whether substantial, competent evidence supported the jury's verdict.

**A. The district court properly instructed the jury.**

4

1. The jury instructions accurately stated Idaho employment contract law.

Four Rivers contends that whether the parties entered into an employment contract is a disputed fact and that one of the instructions submitted to the jury infringed upon the jury's role as fact-finder because it instructed the jury that the parties agreed to some terms of an employment contract. The challenged instruction states:

> In this case, the Defendant alleges that all parties did not agree to *all* essential terms of a contract. This requirement is sometimes referred to as the "meeting of the minds," and means that all parties to a contract must have understood and accepted all of the essential terms of the contract.
>
> There is no contract unless all of the essential terms have been communicated to all parties, understood by all parties, and accepted by all parties.

(emphasis added). According to Four Rivers, the instruction's statement that the "parties did not agree to all essential terms" implies that the parties did agree to some terms.[1]

This Court reviews jury instructions as a whole to determine whether a jury has been adequately instructed as to the issues presented and the law. *Silver Creek Computers, Inc.*, 136 Idaho at 882, 42 P.3d at 675. In addition to the above-quoted jury instruction, the jury was instructed as to the elements of an enforceable contract, the presumption that an employment relationship is at will unless duration or justifications for discharge are specified, and Mackay's burden of proving both the existence of a contract and that Four Rivers breached the contract.

Standing alone, the challenged jury instruction made it clear to the jury that there was no contract "unless all of the essential terms" of such contract were communicated, understood, and accepted by both Four Rivers and Mackay. The instruction plainly conditions the existence of an enforceable contract on the parties' communication and acceptance of all essential terms of a contract. We are unable to agree with Four Rivers' strained construction that this instruction advised the jury that the parties agreed to some, but not all terms of a contract, thereby infringing upon the jury's role as fact-finder. In any event, the other jury instructions emphasized to the jury that the relationship between Four Rivers and Mackay was one of at-will employment, absent mutual communication and acceptance of some other term. As the jury was accurately instructed as to the law and, in order to reach its verdict, was required to find that the parties

---

[1] Four Rivers' argument ignores an obvious point. It is undisputed that Four Rivers employed Mackay. Thus, some form of employment contract necessarily existed between the parties. The dispute at trial actually centered on the question whether the terms of that contract included a mutual agreement as to the duration of Mackay's employment.

5

agreed to all terms of the contract, we hold that the challenged jury instruction did not mislead the jury or infringe upon the jury's role as fact-finder.

2. The district court properly denied Four Rivers' request for a jury instruction on the statute of frauds.

Four Rivers argues that the district court improperly refused to instruct the jury regarding the statute of frauds because the evidence supported such an instruction. Four Rivers' argument is predicated on the contention that Mackay testified that the contract was to be for a ten-year period.

Mackay first responds that Four Rivers failed to properly object to the failure to give such an instruction, as required by I.R.C.P. 51(b), and is therefore precluded from asserting error. We disagree. Counsel to Four Rivers stated during the jury instruction conference that:

> If the jury were to conclude that there were a ten-year agreement, I believe it would be essential for them at that time also to have instructions on the statute of frauds, . . . [I request] that they be instructed that if they should find that there is a ten-year agreement, that it is invalid by virtue of the statute of frauds.

A plainer request for an instruction on the statute of frauds is difficult to imagine. We find that Four Rivers preserved this issue for review by this Court.

Mackay next contends that the district court properly refused Four Rivers' requested instruction because this Court ruled in *Mackay I* that the parties' contract was outside the statute of frauds as a matter of law. *Mackay I* considered an appeal from the district court's grant of summary judgment dismissing Mackay's contract claim for failure to comply with the statute of frauds. *Mackay I*, 145 Idaho at 410, 179 P.3d at 1066. Given the procedural posture of the appeal, this Court was required on review to construe all disputed facts and reasonable inferences in favor of Mackay, the nonmoving party, and determine whether Four Rivers was entitled to judgment as a matter of law. *Id.* Mackay misconstrues this Court's holding in *Mackay I*, as we explicitly recognized that the duration of the alleged contract was an unresolved question of fact and therefore the district court erred by granting summary judgment. *Id.* at 412, 179 P.3d at 1068.

Thus, we turn to the substance of Four Rivers' claim of error, i.e., whether the district court improperly denied Four Rivers' request for an instruction relating to the statute of frauds. We hold that it did not. If a party's "theory is supported by any reasonable view of the evidence," the party is entitled to a jury instruction on that theory. *Vanderford Co. v. Knudson*,

6

144 Idaho 547, 555, 165 P.3d 261, 269 (2007) (citing *Doty v. Bishara*, 123 Idaho 329, 334, 848 P.2d 387, 392 (1992)).

Our review of the testimony presented at trial reveals that there was no evidentiary support for a statute of frauds jury instruction. Witnesses for Four Rivers repeatedly and consistently testified that there was no agreement as to the duration of Mackay's employment. Thus, Four Rivers relies solely upon Mackay's testimony in support of its contention that his claim of promised long-term employment is invalid under the statute of frauds. Four Rivers urges this Court to interpret Mackay's testimony as an offer of employment for ten years, which would necessitate an instruction as to the statute of frauds.

Resolution of this issue has required careful consideration of the evidence presented at trial as to the duration of the employment offer to determine whether Mackay's employment was to be for a ten-year period, as contended by Four Rivers, or whether it was to continue until he chose to retire, as Mackay contends on appeal. This is so because if the evidence could reasonably be viewed as Four Rivers contends, then the district court was required to instruct the jury as to the statute of frauds. *Burton v. Atomic Workers Fed. Credit Union*, 119 Idaho 17, 19-20, 803 P.2d 518, 520-21 (1990) (failure to give statute of frauds jury instruction on claimed contract of employment to age 65, which could not by its terms have been performed within one year, held to be reversible error). However, if the only reasonable view of Mackay's testimony is that the term of his employment was until he chose to retire, the contract would fall outside the statute of frauds. *Mackay I*, 145 Idaho at 412, 179 P.3d at 1068.

The evidence on this subject primarily consisted of Mackay's testimony, including his explanation of a diary entry he made at the time (admitted as the second page of Exhibit G), and Mackay's wife's testimony.

At trial, Mackay repeatedly characterized the offer as one of long-term employment, lasting until he decided to retire. He also repeatedly testified that he informed Smith that his retirement could be as long as ten years from the time of the agreement. He initially testified as to the duration of his employment in response to questions from his attorney:

> Q. And, Mr. Mackay, tell us who made the offer to you and how it was made.
> A. Randy Smith, the general manager -- the office building at Four Rivers, there is a sales office it's called, which is a large room. My office was kind of around the corner out of the way.

7

Randy was in talking to Dennis Palmer, the salesman. He came into my office, we B.S.'d a little bit.

Randy said, I would like to offer you a long-term employment agreement. I told Randy at the time I enjoyed the onion business, I enjoyed working for Four Rivers, but I might not retire for four -- for ten years.

That didn't seem to be a problem. I told him I wanted to go home and talk to my wife before I accepted it. I did this.

The next morning I came back, we sat down and shook hands about it, talked a little bit how we were going to procure onions, the long-range development of Four Rivers, and away we went.

Q. And, Mr. Mackay, it sounds like after the offer was made to you by Mr. Smith, you didn't accept it right away, you went home and talked to your wife and then came --

A. Yes, I did.

Q. -- back the next day?

A. We been married a long time.

Q. Okay. And when you came back the next day, tell us where you met Mr. Smith and how – the type of discussion that you had with him at that point in time.

A. As near as I can recall, we were either in the sales office or in my office. I told Randy I'd like to accept his offer, I enjoyed working for Four Rivers, I thought we could do a good thing together, I thought we could both be there until we retired and enjoy a good life.

Q. And was there any discussion about the duration of the contract?

A. At that time I again expressed to Randy that I may not retire for ten years.

That wasn't a problem to Randy.

Defense counsel briefly questioned Mackay on this subject in voir dire in aid of an objection based upon the statute of frauds. The district court curtailed the questioning, ruling that it was more appropriately developed in cross-examination. Mackay's attorney then elicited the following clarification from Mackay:

Q. Mr. Mackay, perhaps to try and clarify, the agreement you had reached with Mr. Smith meant that you have could stay on until you decided to retire?

A. Yes, that's correct.

Q. And did you indicate how long it might be before you retire?

A. Yes. I told Mr. Smith my plans at that time, retirement was ten years off.

Q. Under the agreement that you had with Mr. Smith, did you understand that if you wanted to you could have chosen to retire before the ten years?

A. *The agreement between Mr. Smith and I, I would be employed by Four Rivers for ten years.*

Q. And what if you decided you wanted to retire before ten years had run, could you have done that?

A. Nothing was ever said that I could not do it, no.

Q. And so under the agreement, who determined when it was your time to retire?
A. Myself.
Q. Okay. And if you decided to retire in the first year, do you believe you would have been in breach of your commitment to them?
A. No.
Q. Okay. And so when you were talking with Mr. Smith, you indicated you may not retire for another ten years?
A. Yes, my plans at that time were to work an additional ten years.

(emphasis added). On cross-examination, defense counsel explored the discussions between Smith and Mackay as to the terms of the offer of long-term employment:

Q. Okay. All right. Now, let's go to the morning of March 3, 2000. Now, you testified that it was sometime in March that you met with Randy, but we've introduced an exhibit on your desk pad indicating that March 3 you noted that an offer was made to you by Randy Smith. Is that correct?
A. Yes.
Q. Let's talk about that. What do you recall him saying to you at the very outset? What did he say? Can you remember his exact words, or as close as you can? What was it that was said to you?
A. Don't remember his exact words. Said, I'd like to offer you long-term employment.
Q. Okay. And after he said that, did he define for you what he meant by "long-term"?
A. I think my reply back to Randy was --
Q. Well, no, no, my question is, did he define, and by long-term I mean? Did he do that? Did he tell you what he meant by "long-term"?
A. Not that I recall, no.
Q. Okay. All right. So you then said something to him, didn't you?
A. Yes, I did.
Q. And that had something to do with your retirement?
A. Yes.
Q. And what do you recall saying to him?
A. I told Randy that I, at the present time, did not plan to retire for approximately ten years. Randy said that was fine with him, when I reached that point in time we'd discuss whether I wanted to work longer or whether I wanted to retire.
Q. So what you understood Mr. Smith to say to you was, I'm offering you employment with Four Rivers Packing for ten years?
A. Until I wanted to retire.
Q. But you said that that would be ten years; correct?
A. I said it could be ten years.

Four Rivers' attorney then examined Mackay about his deposition testimony regarding the duration of the employment offer and Exhibit G:

Q.     All right.  Now line 21, I asked you the question, "He, referring to Randy Smith, told me I had a job as long as I wanted one.  Is that exactly what he said." What was your answer to that question, on line 23?

A.     "Very close."

Q.     I then asked, "you then went on and state, Randy told me he hoped I stayed until I retired.  Is that an accurate statement?"

A.     "Very close."

Q.     "Okay.  Do you recall, did he use the word 'hope,' that he hoped you'd stay?"

A.     "I don't recall."

Q.     "This note" – and I was referring to your calendar note that has been admitted into evidence – "does not reflect the promises of lifetime employment based on what you wrote there.  Could you explain to me and you've indicated that this is a fairly accurate statement of what Randy said, maybe not exactly."   Your attorney then objected,  and I again asked another question on line 12 of page 32.

"Would it be correct to say that you and Randy were talking in generalities about possibilities?"

Your answer starting on line 15?

A.     Would you want me --

Q.     Would you read that, please?

A.     *"At that time I  explained to Randy that possible retirement was ten years away and my impression was the offer was good for ten years after that, Then it depended on what I wanted to do after ten years."*

Q.     Now, if you would turn to page 92 of the deposition.

If you'll tell me when you're on page 92.

***

Q.     Thank you.  And if you would refer to line 10.

A.     Okay.

Q.     Now, this is a question that your attorney asked you, so I'll ask the question that Mr. Johnson asked you at that time.

"And if you would, Mr. Mackay, tell me everything you recall about the conversation you had with Mr. Smith."

A.     "I was in my office at the time.  My office and the sales office where Randy had his office  adjoined each other.  Randy then talked to the  salesman at that time, Mr. Palmer.  He came in and we  B.S.'d like we did every day a little bit.    Randy  made  the  comment  that  I'd  like  to  offer  you  long-term employment.  I told him I expected to work ten years until I retire.  He said that was  fine, I had a job  as long as I wanted, he hoped I would  stay until  I retired. I told him I wanted to go home and talk to my wife about it.  I did that.  I returned the next morning and accepted his -- I told Randy I'd like to take the offer.   We shook hands and basically  the discussion was, how do we get enough onions,  I go, let's go. We  just went to work."

(emphasis added).  Mackay's attorney later questioned him about the manner of the offer of employment and his acceptance:

Q.   And about the duration of the contract, what was discussed between the two of you on that point?

A.   I told Randy at the time that I may not retire for ten years.   I didn't know exactly what I was going to do, how long it was going to be before I retired. I told Randy it may be ten years.

He said, that's fine, I have no problem with that.

Q.   Was it discussed the reason that you could be terminated?

A.   Yes.  We, for lack of a better term, called it a code of conduct.  I was advised not to get a D.W.I.  I was advised drugs, alcohol, things like that were out of the question.  I had to represent Four Rivers all the time, even on my own time out in public anywhere.   I was Four Rivers' ambassador, for lack of a better term.  I represented them constantly.  I could not share any privileged information about Four Rivers with anybody else. Couldn't do business, couldn't work for anybody else.  Couldn't do business with another shed.  Couldn't share information with another shed.

Q.   And, Mr. Mackay, let me ask you a question about that.  Did you understand there was a duty of loyalty involved in your --

A.   Yes, most definitely.

Q.   -- relationship?

A.   If I had chosen to retire, I was retired.  I couldn't go to work – I couldn't work for Four Rivers this day and retire and go to work for shed B the next day. I really couldn't go to work for anybody.  If I chose to retire, I was retired. So there definitely was a sense of loyalty or I was bound to Four Rivers – bound's maybe not the right word, *but my agreement was for ten years,* if I was going to work I was going to work for Four Rivers, nobody else.

Q.   And, Mr. Mackay, did you communicate your acceptance of the employment offer?

A.   Excuse me?

Q.   Did you accept the employment offer?

A.   Yes, I did.

Q.   Okay.  And you mentioned that you maybe spoke with your wife about that first or --

A.   Yes.  We'd been married a long time.  We discussed basically everything. So I went home and told her what Randy and I had talked about, our agreement was going to be the same.

She thought it was a good fit.  I like the onion business, it fit our lifestyle.

Q.   And, Mr. Mackay, then did you explain to Mr. Smith that you wanted the job?

A.   Yes, most definitely I told him I would be very happy to accept his offer.

Q.   And when did that conversation take place?

A    The next morning, as I recall.

Q.   And take us through that.  Who was all present and what was discussed and --

A.   As far as I recall, Randy was in his office, the salesman wasn't there at the time.  We went through our morning bins like we usually do, and I said,

11

I'd like to accept your offer. It fits my lifestyle, fits my wife's lifestyle and kids, *and I definitely would like to have a job for the next ten years.*
Q. Did you and Mr. Smith shake hands?
A. Yes, we did.

(emphasis added).

Mackay then testified as to his diary notes, admitted as Exhibit G, relating to the offer of employment:

Q: And what makes up Exhibit G?
A. They appear to be pages out of my diaries.
Q. Out of notes that you kept while you were working at Four Rivers?
A. Yes.
Q. And, Mr. Mackay, is there an entry in there that makes reference to the discussion you had with Mr. Randy Smith about long-term employment?
A. Yes. I believe it will be early February.
Q. And is that G -- Exhibit G-2? Take a look at Exhibit G-2 and see if that --
A. G-2?
Q. Yes, page 2.
A. Yes.
Q. Okay. Identify that for us if you would.
A. It's a diary entry March 3, which was a Friday, that says, "Talked to Randy about future plans for job. Told me I had a job as long as I wanted one. Randy told me he hoped I stayed until I retire."
Q. And that's an entry you made in your diary on the same day of the discussion or --
A. Yes, very close.

Mackay was then cross-examined about the diary entry and the circumstances of his conversations with Smith:

Q. Now, in your note before you, you stated, "Randy told me he hoped I stayed until I retired." And you testified yesterday that you told Mr. Smith that you may not retire for ten years.
A. That's true.
Q. But at that time you had no plans of retiring, did you?
A. In the back of my mind it was a possibility, but not in the front my mind, no.
MR. BIRCH: Your Honor, may I approach the reporter? She has a transcript that I would like to use.
THE COURT: Sure.
MR. BIRCH: Thank you.
BY MR. BIRCH:
Q. Handing you this document, Mr. Mackay, now it's correct that you have had an opportunity to testify before this court in this case previously, haven't you?

A.  Yes.

Q.  And on that occasion you were sworn to tell the truth?

A.  Yes.

Q.  And you understood and the appreciated the importance of that oath?

A.  Yes.

Q.  And you testified regarding these same issues, didn't you?

A.  And some more, yes.

Q.  Okay. And if you would please turn in the document I just handed you to page 31. Now you just testified that in the back of your mind retirement was something that might come in the near future or ten years; correct? Mr. Mackay?

A.  Excuse me.

Q.  Just testified a moment ago that retirement was something which in the back of your mind might come sooner than the ten years you told Mr. Smith, or you say you told Mr. Smith you were going to retire.

A.  Yes, that's true.

Q.  If you would refer to page 31 line 12, you were being asked a question by your attorney, and I'm going to read the question and ask you to read the response you made at that time.

You were asked by your attorney, "And did you indicate how long it might be before you retire?"

If you read lines 14 and 15.

A.  "Yes. I told Mr. Smith my plans at that time, retirement was ten years off."

Q.  Your attorney then asked you, "Under the agreement that you had with Mr. Smith, did you understand that if you wanted you could have chosen to retire before the ten years?"

Would you read lines 19 and 20.

A.  *"The agreement between Mr. Smith and I, I would be employed by Four Rivers for ten years."* "And what if you decided you wanted" --

Q.  No, if you'd stop right there, please.

And if you got to page 32 you were asked this question by your attorney. "And so when you" this is on line 8 – "and so when you were talking to Mr. Smith, you indicated you may not retire for another ten years?"

If you'd read lines 11 and 12.

A.  *"Yes, my plans at that time were to work an additional ten years."*

Q.  *Okay. So based on your testimony then and now, as I understand it, you had a contract or you believed you had a contract or an agreement with Randy Smith to be employed by Four Rivers for ten years. That's what you said.*

A.  *Yes*, unless I wished to retire quicker.

Q.  But you didn't say that when you were under oath previously?

A.  I don't believe you asked me.

(emphasis added).

The only other testimony relating to the duration of Mackay's employment was developed by defense counsel in his cross-examination of Mackay's wife, Martha:

13

Q. And you have a specific recollection of Mr. Mackay talking to you about a long contract with Four Rivers?
A. Well yes. That's very important in one's life, one's livelihood. Of course.
Q. So let's be a bit more specific. You claim that he came home and talked to you about an offer. What was this offer that he told you had been made?
A. Well, I can't remember specifics of the offer, I just know that he came home, we visited about it. That's a long time ago to remember the specifics.
Q. So all you recall is that he came home and talked to you about a job offer, that's it?
A. Yes.
Q. And you have no recollection of the duration of this claimed offer?
A. He said long term.
Q. Okay. Other than that you have no recollection of what that meant?
A. Until he chose to retire.
Q. So your recollection now is that he came home and told you he had a long-term offer until he retired?
A. Yes.

If the testimony emphasized by italics were the only evidence presented at trial as to the duration of Mackay's employment offer, a reasonable finder of fact could conclude that the offer of employment was for a fixed period of ten years. Our decision in *Burton v. Atomic Workers Federal Credit Union*, 119 Idaho 17, 803 P.2d 518 (1990) would clearly require reversal of the judgment and a remand of the action for trial with an appropriate instruction relating to the statute of frauds. However, in order to accept Four Rivers' thesis advanced in this appeal that the offer of employment was for a ten-year period, we would have to accept excerpts of testimony extracted in such a manner as to distort the substance of Mackay's testimony.

We cannot do so. Rather, viewing this testimony in its entirety, we conclude that a reasonable jury could not find that Four Rivers, acting through Smith, extended an offer of employment for a ten year period. Rather, accepting the veracity of the Mackays' testimony (the only basis upon which one could find that any offer of employment of any duration beyond that of an at-will employee), the only reasonable conclusion that could be reached by a jury was that Mackay was offered long-term employment until he chose to retire and that Mackay had communicated his intention to work for as long as ten years prior to his retirement. As we held in *Mackay I*, a contract of employment until such time as Mackay decided to retire does not fall within the statute of frauds. Therefore, the district court properly denied Four Rivers' request for a statute of frauds jury instruction.

**B. There is substantial, competent evidence to support the jury verdict.**

14

Four Rivers argues that the jury verdict is not supported by substantial, competent evidence because no reasonable jury would find that a new and financially-strapped employer would extend an offer of long-term employment to its employee.[2] "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Uhl v. Ballard Med. Prods., Inc.*, 138 Idaho 653, 657, 67 P.3d 1265, 1269 (2003). While there was evidence in the record that Four Rivers experienced financial difficulties, there was also evidence that Four Rivers offered Mackay long term employment. Mackay testified that Smith offered him the contract, that he consulted his wife about the offer, and that he accepted the offer and explained to Smith that he might not retire for up to ten years. Mackay's diary notes also referred to Smith's offer of long-term employment. Further, Mackay testified that he refused to sign the proposed written employment contract drafted by Four Rivers because they did not express the long-term nature of his employment, and that he worked throughout the period of the injunction to keep Four Rivers' prospects alive because he wanted to protect his interest in the long-term position. Mackay's wife also testified that Four Rivers offered Mackay a "long-term contract" that was intended to last until Mackay retired.

Four Rivers also challenges the sufficiency of the evidence supporting the jury's finding that Four Rivers breached the long-term employment agreement, pointing to evidence that suggests Mackay was terminated because he had failed to fulfill his employment obligations. However, testimony in the record indicates that after the first season, competitors often outbid Four Rivers, based upon the prices Smith was willing to pay for onions, causing Mackay to struggle to obtain onions. Additionally, there was evidence supporting the inference that the injunction damaged Four Rivers' reputation, negatively impacting Mackay's ability to perform his onion procurement duties.

Despite conflicting evidence in the record, a reasonable mind could have reached the conclusions reached by the jury. The jury weighed the parties' conflicting evidence, assessed the credibility of the witnesses, and determined Mackay's version of the facts to be more probably true. Since substantial evidence in the record supports the jury's findings, we decline to second

---

[2] Mackay contends that Four Rivers' challenge to the sufficiency of the evidence supporting the jury verdict is not properly before this Court because Four Rivers did not raise the challenge below. However, "[t]he failure of a party to move for a directed verdict, for a judgment notwithstanding the verdict or for a new trial shall not preclude appellate review of the sufficiency of the evidence when proper assignment of error is made in the appellate court." I.R.C.P. 50(b). The issue of whether the jury's verdict is supported by substantial and competent evidence is properly before this Court.

guess the jury's assessment of credibility and the weight to be given to the evidence. We therefore affirm.

## C. Mackay is entitled to attorney fees on appeal pursuant to I.C. § 12-120(3).

"Actions brought for breach of an employment contract are considered commercial transactions and are subject to the attorney fee provision of I.C. § 12-120(3)." *Willie v. Bd. of Trustees*, 138 Idaho 131, 136, 59 P.3d 302, 307 (2002) (citing *Northwest Bec-Corp. v. Home Living Serv.*, 136 Idaho 835, 842, 4 P.3d 263, 270 (2002)). Mackay has prevailed as to all matters on appeal and is therefore entitled to an award of attorney fees under I.C. § 12-120(3).

## IV. CONCLUSION

We affirm the judgment entered upon the jury's verdict. Attorney fees and costs on appeal are awarded to Mackay.

Chief Justice EISMANN and Justices BURDICK, J. JONES and W. JONES **CONCUR**.