# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 38793

|  |  |  |
|---|---|---|
| MARK VAN, | ) | |
| | ) | |
| Plaintiff-Appellant-Cross Respondent, | ) | Twin Falls, June 2014 Term |
| | ) | |
| v. | ) | 2014 Opinion No. 73 |
| | ) | |
| PORTNEUF MEDICAL CENTER, INC., | ) | Filed: August 1, 2014 |
| | ) | |
| Defendant-Respondent-Cross Appellant. | ) | Stephen W. Kenyon, Clerk |
| _____ | ) | |

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Bannock County.  Hon. Robert C. Naftz, District Judge.

The judgment of the district court is <u>affirmed</u> in part and <u>reversed</u> in part.

Nielson Law Office, Pocatello, for appellant. Nick L. Nielson argued.

Moffatt, Thomas, Barrett, Rock & Fields, Chtd., Boise, for respondent.   Patricia M. Olsson argued.

_____

J. JONES, Justice.

Mark Van appeals an adverse jury verdict on his claim against Portneuf Medical Center (PMC) for an alleged violation of the Idaho Protection of Public Employees Act, Idaho Code sections 6-2101−2109 (the "Whistleblower Act"). The jury determined that Van engaged in activity protected by the Whistleblower Act but that the termination of his employment did not result from the protected activity.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mark Van commenced this action in 2005 after his employment was terminated by Portneuf Medical Center. He brought claims of breach of contract and discharge in violation of the Whistleblower Act. After the district court granted summary judgment against him on both claims, Van appealed to this Court, which affirmed the summary judgment on the breach of contract claims but vacated and remanded on the whistleblower claim. *Van v. Portneuf Med. Ctr.*, 147 Idaho 552, 212 P.3d 982 (2009) (hereinafter "*Van I*"). The Court stated the relevant facts as follows in *Van I*:

1

Portneuf Medical Center (PMC) hired Mark Van in 1986 as a mechanic for its Life Flight Program. In 1997 he became the director of maintenance for Life Flight and was responsible for the maintenance of PMC's Life Flight helicopter. In 2001, the Life Flight helicopter crashed while attempting a rescue mission. Van witnessed the crash and rushed to the scene to rescue the pilot. The National Transportation Safety Board ultimately determined that the crash was caused by pilot error and not maintenance issues. Nevertheless, Van felt that the media and the public blamed the crash on the maintenance department and he became protective of its reputation.

After the helicopter crash, Van began reporting numerous perceived violations of state and federal law in what he felt was a defense of the maintenance department's image. Among other things, Van reported his beliefs that pilots had: accumulated too much time on duty; flown the helicopter too low; taken off with ice on the helicopter's rotor blades; and overflown the helicopter by exceeding inspection time intervals. Additionally, while PMC was negotiating the purchase of a new helicopter, Van was asked to review the proposed maintenance contract (the COMP contract) with the vendor, Agusta Helicopter, and recommend what aircraft would be best suited for Life Flight. After reviewing the COMP contract, Van notified PMC he thought there were several loopholes by which Agusta could escape its maintenance responsibilities and he therefore asserted that entering into the COMP contract amounted to a waste of public funds.

Several meetings were scheduled to address the mounting concerns expressed by Van. Shortly after a meeting in April 2005, Van was terminated. PMC asserts that its decision to terminate Van was due to his inability to maintain positive interpersonal relations with his colleagues and to foster a positive team environment. In response, Van filed this lawsuit and alleged in count one that he had been wrongfully terminated in violation of Idaho's Whistleblower Act. I.C. §§ 6–2101 to 2109. In count two Van alleged breach of his employment contract and of the implied covenant of good faith and fair dealing.

. . .

PMC moved for summary judgment against Van arguing that Van (1) did not comply with the notice requirements of the Idaho Tort Claims Act (ITCA), (2) failed to establish a *prima facie* case of wrongful termination under Idaho's Whistleblower Act, and (3) failed to establish a *prima facie* case of breach of employment contract. The district court granted PMC's motion and Van appeal[ed] that decision to this Court.

*Van I*, 147 Idaho at 555–56, 212 P.3d at 985–86. In *Van I* we provided that "[t]he district court's award of attorney fees and costs is vacated. We award no costs or attorney fees on appeal. The district court may award costs and fees incurred with respect to the appeal to the party that prevails on remand." *Id.* at 562, 212 P.3d at 992.

On remand, the district court conducted a jury trial, which resulted in a verdict in favor of PMC on Van's whistleblower claim. PMC sought attorney fees and costs for the district court and appellate proceedings in *Van I*, as well as costs incurred in the trial of the whistleblower claim. The district court awarded $12,063.72 in costs as a matter of right, $4,603.92 in discretionary costs, and $38,192.82 for costs and fees incurred in the appeal of *Van I*. The district court declined to award attorney fees for the district court proceedings in *Van I*. Van appealed the judgment and PMC cross-appealed the denial of fees for the contract claims.

## II. ISSUES RAISED BY THE PARTIES

1. Whether the jury verdict in favor of PMC was based on substantial and competent evidence.

2. Whether the jury's special verdict was contrary to the Whistleblower Act.

3. Whether the district court erred in excluding testimony regarding alleged admissions by PMC employees.

4. Whether the district court erred in admitting emails sent by Van to PMC employees after his termination.

5. Whether the district court erred in limiting the scope of Van's cross-examination of PMC's expert witness.

6. Whether the district court erred in its handling of evidence pertaining to federal statutes and regulations.

7. Whether the district court abused its discretion in declining to instruct the jury on provocation and the spoliation of evidence.

8. Whether the district court erred in holding that the Whistleblower Act does not include damages for pain and suffering and front pay.

9. Whether the district court erred in awarding attorney fees and costs to PMC.

10. Whether the district court erred in refusing to award PMC attorney fees on Van's breach of contract claims.

11. Whether either party is entitled to attorney fees on appeal.

## III. STANDARD OF REVIEW

This Court will not set aside a jury verdict on appeal if it is supported by substantial and competent evidence. *Hurtado v. Land O'Lakes, Inc.*, 153 Idaho 13, 17, 278 P.3d 415, 419 (2012). "All that is required is that the evidence be of such sufficient quantity and probative

value that reasonable minds could conclude that the verdict of the jury was proper." *Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 736, 518 P.2d 1194, 1198 (1974). "[W]hen reviewing a jury verdict on appeal the evidence adduced at trial is construed in a light most favorable to the party who prevailed at trial." *Garrett Freightlines, Inc. v. Bannock Paving Co., Inc.*, 112 Idaho 722, 726, 735 P.2d 1033, 1037 (1987). "On appeal, we will not substitute our opinion for that of the jury with respect to the credibility of witnesses or the weight to be given to, and inferences to be drawn from, the evidence." *Phillips v. Erhart*, 151 Idaho 100, 106−07, 254 P.2d 1, 7−8 (2011).

"Error may not be predicated upon a ruling which admits or excludes evidence unless the ruling is a manifest abuse of the trial court's discretion and a substantial right of the party is affected. *Hurtado*, 153 Idaho at 17, 278 P.3d at 419; I.R.E. 103(a). When determining whether a court abused its discretion, we consider: whether the district court (1) correctly perceived the issue as one of discretion; (2) acted within the outer bounds of its discretion and consistently with applicable legal standards; and (3) reached its decision by an exercise of reason. *Lee v. Nickerson*, 146 Idaho 5, 10, 189 P.3d 467, 472 (2008).

"The propriety of jury instructions is a question of law over which this Court exercises free review, and the standard of review of whether a jury instruction should or should not have been given is whether there is evidence at trial to support the instruction, and whether the instruction is a correct statement of the law." *Mackay v. Four Rivers Packing Co.*, 151 Idaho 388, 391, 257 P.3d 755, 758 (2011). A requested instruction must be given if there is any reasonable view of the evidence to support it. *Bailey v. Sanford*, 139 Idaho 744, 750, 86 P.3d 458, 464 (2004).

## IV. ANALYSIS

### A.      The jury verdict is supported by substantial and competent evidence.

Van claimed that he was discharged in retaliation for engaging in protected activity under the Whistleblower Act. In *Van I*, we held:

> Under Idaho's Whistleblower Act, a *prima facie* case for retaliatory discharge requires Van to show: (1) he was an "employee" who engaged or intended to engage in protected activity; (2) his "employer" took adverse action against him; and (3) the existence of a causal connection between the protected activity and the employer's adverse action.

*Van I*, 147 Idaho at 558, 212 P.3d at 988. Once a plaintiff demonstrates a *prima facie* case, the defendant is obligated to produce evidence of a non-retaliatory reason for the discharge, at which

4

point the burden shifts to the plaintiff to prove by a preponderance of the evidence that the reason advanced by the defendant was a pretext for retaliatory conduct. *Curlee v. Kootenai Cnty. Fire & Rescue*, 148 Idaho 391, 396, 224 P.3d 458, 463 (2008).

The special verdict form submitted to the jury asked three questions:

**QUESTION NO. 1.** Did Plaintiff Mark Van prove by a preponderance of the evidence that he communicated in good faith the existence of violations or suspected violations of laws, rules, or regulation adopted under the law of this state, a political subdivision of the state, or of the United States?

. . .

**QUESTION NO. 2.** Did Plaintiff Mark Van prove by a preponderance of the evidence that he suffered an adverse action?

. . .

**QUESTION NO.** 3. Did Mark Van prove by a preponderance of the evidence that Portneuf Medical Center terminated his employment <u>because</u> he communicated to Portneuf Medical Center, in good faith, violations of suspected violations of law, rules, or regulations adopted under the law of this state, a political subdivision of the state, or of the United States, and that Portneuf Medical Center's reason for terminating Mr. Van was not believable or that it was not the true reason.

(emphasis in original). The jury answered "Yes" to questions one and two but answered "No" to the third question.[1]

Van argues the jury verdict is not supported by substantial and competent evidence because PMC did not demonstrate that it terminated him for a legitimate reason. Van contends that because he was terminated for discord, the Court must conclude the discord arose from protected activity. He claims that because whistleblowing inherently gives rise to discord, the jury was not entitled to consider discord as a ground justifying his dismissal.

PMC argues that the jury's verdict is supported by substantial and competent evidence, particularly that Van was terminated because he was unable to work with people apart from his whistleblowing activity. PMC points to evidence that it was responsive to Van's safety concerns but that Van nevertheless engaged in conduct of a disruptive nature. PMC also argues that the

---

[1] Question three lumps together the issues of causation and pretext. Thus, it is not clear whether the jury found that Van failed to show that his termination was caused by his whistleblowing activity or whether Van failed to rebut PMC's non-retaliatory reason for Van's termination or both. However, the use of a compound question on the special verdict form does not make a difference here because PMC prevails in either event.

jury had before it evidence that Van's continued revisitation of past disputes was interfering with the safety and effective functioning of the Life Flight program.

There was substantial and competent evidence on which the jury could find that Van's termination was not a result of his whistleblowing activities. The jury clearly found that Van engaged in protected activity by raising safety concerns regarding the Life Flight program. Indeed, the record discloses that Van raised a number of valid safety concerns that needed to be addressed. The record indicates that PMC was generally responsive to Van's concerns and implemented policies to address a number of them. However, there was also substantial evidence that Van continued to revisit the issues, even after responsive policies had been adopted, and that he would not allow matters to be put to rest.

A recurrent theme in Van's grievances related to the 2001 helicopter crash referenced in *Van I*. After the accident, PMC released a statement to the effect that the helicopter crashed after it had undergone maintenance and that the cause of the crash was under investigation. Van believed the statement pointed to improper maintenance as the cause of the crash and reflected poorly upon his maintenance section. Van repeatedly urged PMC to publicly clarify that the crash was not caused by faulty maintenance, while PMC responded that it would await the results of the National Transportation Safety Board (NTSB) investigation to address the issue. When the NTSB issued its final report in June 2002, identifying pilot error as the cause of the crash, PMC issued a media statement that "[t]he results of an investigation show mechanical failure was not responsible for a [2001] crash of a Bannock Regional Medical Center LifeFlight helicopter." The statement was not adequate from Van's standpoint, and he continued to raise the issue throughout the remainder of his employment with PMC.

> In August of 2003, Van issued a policy letter to his maintenance personnel stating in part:
>
> > It is apparent to me now, that the new Program Director, Director of Operations and the Chief pilot will shift the blame to Maintenance, even if they have information that will clear Maintenance of any wrong doing. They will be dishonest with Administration to attain their end to cover for the pilots at any cost. I am sorry to say that we have an us against them scenario fostered by the aforementioned staff.
>
> > \* \* \*
>
> > Since the powers that be conspired to shift the blame to our department for Tim's [2001] accident. I feel it is our responsibility to baby sit the pilots and question there [sic] fitness for flight, or any other pilot activities that could cause a situation that could blacken our reputations or the programs. The only thing I

6

could be guilty of with Tim's accident was letting him take off after I made my repairs. I will not in the future, let pilots fly away after maintenance if I feel the aircraft is at risk. I want you to cover your ass and follow this policy also.

I talked to Carl Mcguire of the FAA. The only way we can stop the pilot from flying away, is to legally disable the aircraft so it can't be started. With a write up of the work accomplished. I would suggest that the battery be removed and secured in your vehicle, before repairs are completed to return the aircraft to service (if you believe the pilot should not fly home for whatever reason). Leave the location with the battery so it cannot be reinstalled.

This policy letter, which came out about two years after the crash and a year after PMC's clarification, certainly evidences an inability to let go, as well as distrust of management and of Life Flight pilots. Van's suggestion that maintenance personnel remove and conceal the helicopter's battery when they deem a pilot unfit to fly is rather risky business and, according to PMC, violative of its policy. A jury could reasonably have concluded that the policy letter could create distrust and discord among members of the Life Flight team.

Despite Van's contentions that PMC was angered by his raising of safety concerns and resisted addressing them, there was evidence presented to the jury that PMC was responsive to his safety concerns. When Van raised concerns regarding frost and ice on the helicopter's rotor blades, PMC implemented a cold weather policy. When Van again raised such concerns, PMC revised the policy to require pilots to wipe down the blades and install blade covers.

Van also raised concerns with Gary Alzola, who oversaw the Life Flight pilots, that certain Life Flight pilots were flying while fatigued. Van was particularly concerned about an incident in which one pilot was on duty for twenty hours. In response, Alzola and the leadership team of Life Flight implemented a pilot fatigue policy that restricted pilots to a 16-hour day regardless of circumstances.

Van claimed that a pilot deliberately flew a helicopter very low over his house to retaliate against him for reporting the pilot's 20-hour stretch of duty, which led to the adoption of PMC's pilot fatigue policy. Alzola testified that he investigated the incident and found the helicopter was flying low because it was carrying a patient whose condition would be affected by higher altitudes. The jury heard evidence that no FAA regulations were violated and that Alzola informed the pilot to attempt to avoid homes in the future.

Van also raised concerns to Alzola about an incident where a pilot over-flew the helicopter between inspections. However, the jury heard evidence that Alzola reported the

7

overflights to the FAA along with proposed corrective action. The proposed corrective action included inspecting the aircraft if it was within five hours of a required inspection, requiring pilots to discuss required maintenance with the mechanic, and personally reviewing records to ensure compliance. The FAA accepted these proposals.

Thus, the jury had before it substantial evidence that Van raised a number of valid safety concerns and that PMC took action to address most of those concerns. The record indicates that PMC's solutions did not always meet Van's expectations, such as his demands to fire certain employees connected with some of his safety concerns, but that PMC had reasonable explanations for the corrective actions it did take.

The jury also heard evidence that, aside from his safety concerns, Van had difficulty working with his colleagues on the Life Flight team. On April 1, 2005, approximately three weeks before Van's termination, the chief flight nurse, who supervised the medical crew, emailed the Life Flight program director:

> I am pretty disturbed by what I am hearing. I think this ongoing battle between the pilots and [Van] is becoming a safety concern. I think this is a relationship that must involve trust and also must involve respect. I think there is absolutely none of either. As a member of the medical crew I and the rest of the crew put our trust in both of these groups on a daily basis and it is making me nervous. I also think this poses a threat to the cohesiveness of our team. I see already the taking of sides and that is never a good sign. I know that none of this is news to you but I wonder if there is a resolution. I am willing to help in any way that I can, but I think something must be done.

At about the same time, Van told Audrey Fletcher in PMC's human resources department about a February confrontation he'd had on the helipad with a pilot. In trying to resolve the matter, Fletcher determined that the problem was larger than a single confrontation, which resulted in a broader inquiry into apparent dysfunction within the Life Flight team. She therefore interviewed a number of team members.

One pilot, who indicated he was friendly with Van outside of work, related that Van's "behavior has caused [a] serious rift and is jeopardizing the program." He noted that Van was "unable to accept safety measures put in place that are not his own." Fletcher received similar feedback from other pilots. Two mechanics who worked with Van indicated a lack of trust and teamwork in the Life Flight team. One of the mechanics noted that Van would not let go of issues and "constantly refers to pilots trying to get something by him." He indicated that Van "tends to hammer on the issue" when pilots don't do what he wants. Another team member

related that on safety issues "people [are] looking over [their] shoulder—huge distraction. [Van] has created a work environment that has everyone looking their shoulders." Fletcher concluded that the Life Flight team was "broken beyond compare" as a result of Van's behavior and recommended that Van be terminated.

At trial, the program director testified that the culture on the team was breaking down because of Van's disputes with the pilots. The chief flight nurse testified that "at some point the inability to work together . . . creates the potential for safety problems" and that "[e]veryone was kind of on pins and needles with [Van] and the contentious environment that resulted."

Although the evidence was clearly not one-sided—a number of the witnesses testified that Van was a good mechanic and generally well motivated—the jury had substantial and competent evidence upon which to base its verdict in favor of PMC.

However, Van contends that discord is not a valid non-retaliatory reason for termination in a whistleblower case. That is, since whistleblowing activity inherently creates discord, such a ground for termination cannot be used in a whistleblowing case. "The inability to maintain positive interpersonal relations with colleagues and to foster a positive team environment cannot be a legitimate non-retaliatory reason for discharge, because whistle-blowing, by definition, pits one person against another." Van cites no legal authority for the proposition that discord cannot provide grounds for termination in a whistleblower case. Indeed, such a rule would not be wise public policy. While whistleblowers can perform a valuable public service, such a rule would give potential whistleblowers free rein to create unnecessary discord in their organization by immunizing them from disciplinary action. A distinction can and must be made between discord that is related to the whistleblowing activity and discord that is unrelated to such activity. To disallow discord as a grounds for termination when it is separate and apart from any discord that may be inherent in the whistleblowing activity would be unwise. A properly-instructed jury can draw the distinction between the type of discord that may inhere from whistleblowing and that which goes above and beyond protected activity. We decline to rule as a matter of law that PMC's proffered non-retaliatory reason for discharge is not legitimate in the Whistleblower Act setting.

**B.      The special verdict was not contrary to the Whistleblower Act.**

Closely related to his previous argument, Van contends the jury's special verdict was not consistent with the Whistleblower Act because, if entities are permitted to terminate individuals

on the basis of discord arising from protected activity, the purposes of the Whistleblower Act will be meaningless. PMC argues that the jury verdict is consistent with the Whistleblower Act because, even though the jury specifically found that Van had engaged in protected activity, it also specifically found that his employment was not terminated because of that. PMC points out that Van did not object to the special verdict instruction or form and cannot raise an objection to them for the first time on appeal.

A party may not challenge a jury instruction on appeal unless it was specifically challenged in the record below. *Chapman v. Chapman*, 147 Idaho 756, 761–62, 215 P.3d 476, 481–82 (2009). Van waived this argument because the special verdict instruction and form were not challenged below. Further, the jury verdict is not contrary to the Whistleblower Act because not all protected activity will give rise to discord, and not all discord will necessarily be the result of protected activity. As indicated above, the record contains evidence that Van created substantial discord separate and apart from that which may have been related to his whistleblowing activities. It is the province of the finder of fact to determine the cause of the discord, which the jury did.

## C. Any error in the district court's exclusion of hearsay was harmless.

Van argues the district court committed reversible error when it initially precluded Van and one of his witnesses from testifying about statements made by other employees of PMC. Van had argued that the statements attributed to the PMC employees were admissible under I.R.E. 801(d)(2) as admissions of a party-opponent. The district court disagreed because the employees were not parties to the action. Van contends this denied him the ability to present his case in full and required him to use other methods to get the same information to the jury. PMC argues that the alleged error was harmless because the district court subsequently determined that statements made by PMC employees which were within the scope of their employment would not be excluded as hearsay and allowed Van to conduct further examination with regard to the evidence he sought to elicit.

Regardless of whether or not the statements that Van was initially precluded from presenting were inadmissible hearsay or admissions of a party-opponent, Van has failed to show reversible error. He indicates that he was "forced to invent methods to get the message out without actually stating what the hospital employee had said." His complaint is not so much that he was precluded from getting the evidence into the record but, rather, that the initial exclusion

10

of the testimony "interrupted the flow of evidence." Van does not point to any specific testimony that he was unable to get into the record. Nor did he show that a substantial right of his was affected by the exclusion of any particular evidence, as required by I.R.E. 103(a).

**D.      The district court did not err when it admitted into evidence emails sent by Van to PMC employees after his termination.**

Van argues that the district court erred when it denied his request to exclude from evidence certain emails he sent to PMC employees in January of 2009, because the emails were not relevant. Van argues that the admission of the emails affected his substantial rights because the emails were sent four years after his termination and thus misled the jury into believing that post-termination actions on his part were relevant to his termination. Van argues that the emails had the effect of unfairly prejudicing, confusing, or misleading the jury.

PMC argues that the district court did not err in admitting the emails because they demonstrated Van's pattern of distrust and antagonism toward the people with whom he worked and his inability to let go of his grievances. PMC asserts the emails were not too remote to demonstrate the dynamic of Van's working relationships because the district court admitted evidence proffered by Van from as early as 1993.

Relevant evidence is any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401. "The question of whether evidence is relevant is reviewed de novo, while the decision to admit relevant evidence is reviewed for abuse of discretion." *Perception Const. Management, Inc. v. Bell*, 151 Idaho 250, 253, 254 P.3d 1246, 1249 (2011).

Although Van's objection relates to "emails" that should have been excluded from evidence, he only objected to one particular email. That email was sent by Van, under the pseudonym Dale Larsen, to PMC president Pat Hermanson. In the email, Van accused Hermanson of holding a degree in "hospital implosion" and spraying "perfume on the turds." Attached to the email was a picture of a Life Flight pilot sweeping snow and frost from the helicopter blades. This email was similar to three other emails, which were admitted into evidence without objection, that Van sent to PMC employees with pictures of a pilot sweeping snow off of the helicopter blades, one of which simply read "what a dumbass." At issue was whether Van was terminated for raising safety concerns about Life Flight, or whether he was terminated for fostering discord in the Life Flight program. This email, sent four years after his

termination, was relevant to show that Van carried a grudge and that he could simply not let go of a previous complaint, even when it had been addressed. These traits played a significant part in his termination and had some relevance in the trial of the whistleblower claim. Van has not shown that the district court abused its discretion by admitting the email into evidence.

E.   **Van waived the issue of whether the district court erred in limiting the scope of Van's cross-examination of PMC's expert witness.**

Van identifies the following question as an issue on appeal: "Did the trial Court commit reversible error by prohibiting Plaintiff to cross examine Defendant's expert regarding certain information?" However, Van includes no section in his opening brief discussing this issue. He fails to identify the witness, the questions he wished to ask, or what "certain information" means. This Court has repeatedly held that where "issues on appeal are not supported by propositions of law, authority, or argument, they will not be considered" and that "[a] party waives an issue cited on appeal if either authority or argument is lacking, not just both are lacking." *Hurtado v. Land O'Lakes, Inc.*, 153 Idaho 13, 17, 278 P.3d 415, 419 (2012). Van waived this issue on appeal.

F.   **Van waived the issue of whether the district court erred in its handling of evidence pertaining to federal statutes and regulations.**

Van identifies the following question as an issue on appeal: "Did the trial Court commit reversible error with regard to its handling of certain evidence pertaining to federal statutes and regulations?" However, Van includes no section in his opening brief discussing this issue. Van fails to identify what evidence he offered that pertained to any federal statute or regulation. Indeed, the table of authorities in Van's opening brief does not cite to a single federal statute or regulation. It is possible that Van sees this as a corollary issue to his proposed provocation instruction. Nonetheless, Van fails to identify in that section of his brief what evidence relating to these rules and regulations he was precluded from presenting or to identify any pertinent federal regulations or statutes. Van waived this issue by failing to provide pertinent authority or argument.

G.   **The district court did not err in declining to instruct the jury on provocation and spoliation of evidence.**

   *1.   Provocation Instruction.*

Van argues that the district court abused its discretion when it failed to give a jury instruction on the question of whether Van's actions were appropriate because he was provoked by his employer for reporting safety concerns. PMC argues that Van failed to show that his jury

instruction was a correct statement of Idaho law. PMC also argues that the evidence does not support an instruction on provocation because the evidence does not indicate that Van's behavior was an immediate or emotional response to protected activity.

The district court did not err when it declined to instruct the jury on provocation. Van's complaint does not rely on any federal causes of action. Rather, Van relies on Idaho's Whistleblower Act for relief. Van cites federal cases and a law review article as support for the proposed jury instruction, but he fails to cite to any authority indicating that Idaho recognizes the provocation doctrine. On appeal, Van simply presumes that federal court decisions based on statutes other than the Idaho Whistleblower Act mandate Idaho's acceptance of this doctrine. His argument is based entirely on whether the evidence supports this presumed rule.

Federal cases look at whether the conduct in question was impulsive, arose as an emotional outburst, or was a response to a violation of the employee's rights. *See Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1022 (10th Cir. 2004) (finding provocation where employee yelled obscenities at his boss shortly after being subject to anti-Semitic actions); *Precision Window Mfg., Inc. v. NLRB*, 963 F.2d 1105 (8th Cir. 1992) (finding provocation where an employee yelled obscenities at a party immediately after being terminated). This Court has not adopted the provocation doctrine and we see no need to consider whether to do so under the facts of this case.

The evidence does not support a provocation claim because Van's behavior was neither an impulsive or emotional response. Indeed, part of the reason Van was terminated was because he held onto grudges and could not let them go. Van complained about the 2001 accident for years after PMC acknowledged the accident was not the result of mechanical failure and amended its information release policies. Van complained about the pilots for years after he was terminated, after PMC took corrective action, after program leaders investigated pilot behavior, and after PMC amended or adopted several policies in response to Van's concerns. This evidence demonstrates that Van was not acting on impulse or emotion to what he perceived as retaliation but that Van had difficult working relationships with his colleagues.

2.      *Spoliation of Evidence Instruction.*

Van claims that the district court erred in refusing to give a jury instruction pertaining to spoliation of evidence. Once more, Van fails to discuss this issue at all. It is wholly unclear from Van's brief what he is talking about. Therefore, Van waived this issue.

**H.** **We do not decide whether a Whistleblower Act plaintiff may recover damages for pain and suffering and front pay.**

Because we uphold the judgment on the jury verdict, we need not address Van's issue regarding damages. That is, since the jury found no Whistleblower Act liability, the issue of damages is moot.

**I.** **The district court did not err when it awarded costs to PMC.**

The district court granted costs to PMC pursuant to Idaho Code section 12-101 and I.R.C.P. 54(d). "Idaho Code section 12-101 gives courts authority to award costs 'in a civil trial or proceeding . . . in the manner and in the amount provided for by the Idaho Rules of Civil Procedure.'" *Sanders v. Bd. of Trustees of Mountain Home School Dist. No. 193*, 156 Idaho 269, 273, 322 P.3d 1002, 1006 (2014). "Courts award discretionary costs to a prevailing party under I.R.C.P. 54(d)(1)(D)." *Id.* at 274, 322 P.3d at 1007. The total cost award was $16,707.64, consisting of $12,063.72 for costs as a matter of right for district court proceedings in *Van I* and on remand, $4,603.92 in discretionary costs for district court proceedings, and $40 for costs on appeal in *Van I*.

Van argues the district court erred in awarding costs under Idaho Code section 12-101, because Idaho Code section 6-2107 in the Whistleblower Act is a more specific statute and the one that should have been applied by the district court. PMC did not request costs under the Whistleblower Act provision. PMC argues that the district court correctly awarded costs pursuant to Idaho Code section 12-101, that Idaho Code section 6-2107 is not more specific, and that the latter section does not supplant or replace section 12-101.

While Idaho Code section 6-2107 does provide that a court "may . . . order that . . . court costs be awarded to an employer if the court determines that an action brought by an employee under this chapter is without basis in law or in fact," that provision is not applicable to the contract claim proceedings in *Van I,* nor is it applicable here since no determination has been made that Van brought his action without basis in law or in fact. Rather, Idaho Code section 12-101, which provides that "[c]osts shall be awarded by the court in a civil trial or proceeding to the parties in the manner and in the amount provided for by the Idaho Rules of Civil Procedure," is applicable. I.R.C.P. 54 provides that with certain exceptions not applicable here "costs shall be allowed as a matter of right to the prevailing party." I.R.C.P. 54(d)(1)(A). Discretionary costs "may be allowed upon a showing that said costs were necessary and exceptional costs reasonably incurred, and should in the interest of justice be assessed against the adverse party." I.R.C.P.

14

54(d)(1)(D). PMC was clearly the prevailing party in district court on all of Van's claims. The district court made appropriate findings with regard to discretionary costs and Van has not contended otherwise on appeal. Van's challenge to the cost award is without merit.

**J.     There is no basis for an award of attorney fees in district court.**

In its cross-appeal, PMC asserts that the district court erred in failing to award attorney fees for its successful defense of Van's contract claims in the district court proceedings leading to the appeal in *Van I*. PMC argues that the fee award in the amount of $116,983.60, made in those proceedings by the district court pursuant to Idaho Code section 12-120(3), should be "reinstated." PMC claims the district court erred in concluding that it did not have the authority to award fees for the district court proceedings on the contract claims. The district court determined that it did have the authority to award attorney fees incurred with respect to the appeal in *Van I* and granted PMC $38,152.50 in fees for that appeal. PMC has not sought attorney fees with regard to the trial or appeal of the Whistleblower Act claim.

Van contends that the district court erred in granting PMC any attorney fees, pointing out that PMC's request for fees in the district court was based solely on Idaho Code section 12-121. Indeed, PMC's memorandum of costs and fees in district court sought the award pursuant to "Idaho Code Section 12-121, and the Opinion of the Idaho Supreme Court dated July 7, 2009." In its order granting fees with respect to the *Van I* appeal, the district court noted that PMC had based its fee request on Idaho Code section 12-121. The district court, however, did not specify the statutory basis for making the fee award with respect to the *Van I* appeal nor did it make any findings under Idaho Code section 12-121 or I.R.C.P. 54(e)(1). Rule 54(e)(1) provides that "attorney fees under section 12-121, Idaho Code, may be awarded by the court only when it finds, from the facts presented to it, that the case was brought, pursued or defended frivolously, unreasonably, or without foundation."

Both parties and the district court misinterpreted this Court's holding regarding attorney fees in *Van I*. We vacated the district court's award of attorney fees and costs. *Van I*, 147 Idaho at 562, 212 P.3d at 992. We stated that the "district court may award costs and fees incurred with respect to the appeal to the party that prevails on remand." *Id.* The district court correctly concluded that it could award PMC the costs incurred with regard to defense of the contract claims in the district court proceedings in *Van I*. It was incorrect in concluding that it could not award attorney fees for those same proceedings. This Court vacated the cost and attorney fee

15

award because we had no way of knowing what might occur on remand. We did not know whether there might be another appeal upon the conclusion of the proceedings on the whistleblower claim and, therefore, we were merely advising the district court that any attorney fee award could include fees to which PMC might be entitled with regard to the first appeal so that another appeal would not be necessary just to determine that attorney fee issue.

Once an attorney fee award is vacated, it is not subject to simple revival, restoration, or reinstatement. It must be properly sought under an appropriate statutory or contractual ground. The fee award in the district court proceedings prior to the appeal in *Van I* was made pursuant to Idaho Code section 12-120(3). That award was vacated in *Van I.* In the district court proceedings following the conclusion of the whistleblower claim trial, PMC sought its fee award pursuant to Idaho Code section 12-121, rather than Idaho Code section 12-120(3). A fee award may not be made under Idaho Code section 12-121 without a specific finding by the district court that the case was brought, pursued, or defended frivolously, unreasonably, or without foundation. There is no such finding by the district court in this case. Therefore, we affirm the district court's denial of attorney fees with regard to the contract claim proceedings in district court in *Van I* and we reverse the fee award with regard to the appeal in *Van I.* This reduces PMC's final judgment to the total amount of $16,707.64, which bears interest at the legal rate from June 28, 2011.

**K.      Neither party is entitled to costs or attorney fees on appeal.**

Both parties request costs and attorney fees on appeal. However, neither party can be said to have prevailed on appeal. PMC prevailed on Van's appeal and Van prevailed on PMC's cross-appeal. Therefore, we decline to award costs or fees to either party.

## V. CONCLUSION

The judgment of the district court is affirmed, except for the award of attorney fees to PMC which is reversed. Neither party is entitled to costs or fees on this appeal.

Chief Justice BURDICK, and Justices EISMANN and HORTON and Justice Pro Tem WALTERS CONCUR.