**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 47133**

| | |
|---|---|
| ANDREW HAWES, | ) |
| | ) |
|   Plaintiff-Counterdefendant-<br>  Respondent, | ) |
| | ) Boise, September 2020 Term |
| | ) |
| v. | ) Opinion Filed: December 18, 2020 |
| | ) |
| WESTERN PACIFIC TIMBER, LLC, | ) Melanie Gagnepain, Clerk |
| | ) |
|   Defendant-Counterclaimant-<br>  Appellant. | ) |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Gerald F. Schroeder, Senior District Judge.

The judgment of the district court is affirmed.

Givens Pursley, LLP, Boise, for Appellant. Amber Dina argued.

Hepworth Holzer, LLP Boise, for Respondent. John J. Janis argued.

———————————

STEGNER, Justice.

This case involves an alleged severance agreement between Andrew Hawes (Hawes) and Western Pacific Timber, LLC (WPT). Originally, WPT was solely owned by Timothy Blixseth (Blixseth). The crux of this case is Hawes' contention that Blixseth hired him to be general counsel for WPT in 2005, and that when he was hired, Blixseth agreed on behalf of WPT to provide him with a severance package based on the length of his employment. After 2012, Blixseth no longer retained any ownership interest or management responsibility in WPT. When WPT terminated Hawes' employment in 2017, Hawes asserted that he had a severance agreement in place—that had been negotiated with Blixseth on behalf of WPT—by which he would receive $100,000 for each year of employment, capped at five years, for a total of $500,000. However, Hawes could not produce a signed copy of any agreement. WPT refused to pay the claimed severance pay, and instead offered a significantly smaller severance package. Hawes rejected WPT's offer.

Hawes then sued WPT for breach of contract. The case proceeded to trial on Hawes' claim of an oral contract. Ultimately, the jury returned a special verdict finding that WPT was liable to

1

Hawes for $500,000 in severance pay, an award which was later trebled by the district court. The district court also awarded Hawes the full amount of his requested attorney fees which constituted 35% of Hawes' gross recovery. WPT unsuccessfully moved for a new trial. This timely appeal followed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background.

Hawes is a licensed attorney in several states, including Idaho, Oregon, and Washington. WPT is a limited liability company which manages, purchases, and sells timber property in Idaho and Washington.

At the outset, it is important to understand that several issues raised by WPT on appeal are based on the fact that Blixseth owned and managed various other companies separate and distinct from WPT when he hired Hawes. In particular, WPT's appeal relies on its contention that when Blixseth hired Hawes, Blixseth did not hire Hawes to work for WPT; rather, WPT contends that Blixseth hired Hawes to work for Blixseth's associated entities which are unrelated to and legally separate from WPT. For this reason, a general background of the involved business entities is necessary.

1. The business entities at issue.

In 2005, Blixseth and his wife Edra were the sole owners of Blixseth Group, Inc. (BGI), a corporation based in California. BGI had several affiliated entities for which it performed administrative functions such as payroll and human resources. These entities included:

- WPT, a timber company created and originally owned by Blixseth in his individual capacity. WPT focused on acquisition, sale, and management of timber property in Idaho and Washington.[1]

- Yellowstone Development, LLC, a company that managed a resort in Big Sky, Montana.

- Yellowstone Club, a resort and residential community in Montana.

---

[1] Much of WPT's business strategy focused on land exchanges ("land swaps"), where privately owned property would be traded to the United States Forest Service (USFS) in exchange for similarly valued land owned elsewhere by the USFS. WPT acquired a key piece of property at the heart of its operations in Idaho in 2005, which was known as "Lochsa lands," 40,000 acres in remote Idaho County on the Montana border. WPT owned this property in a "checkerboard" ownership where every other section was owned by the USFS. The USFS was apparently interested in the exchange because it would enable the USFS to consolidate its land holdings in the Lochsa area from owning every other section to owning every section. Despite significant work to finalize a "land swap," i.e., trading the Lochsa lands for public land elsewhere, this exchange never came to fruition.

2

- Yellowstone Club World (YCW), a "private international vacation club," which was owned by Yellowstone Club.

In 2007, Blixseth and his wife initiated divorce proceedings and began to separate their assets. Blixseth subsequently formed Blixseth Group of Washington, LLC (BGW), which Blixseth owned in its entirety. For several months in 2009, BGW took over the administrative function previously performed by BGI, the administration of payroll and human resources, for Blixseth's other companies including WPT. In 2009, WPT began to administer its own payroll.

Between 2005 and 2017, ownership and management of WPT changed at two crucial junctures. The first ownership change occurred in 2006, when an entity owned by James Dolan (Dolan) acquired a one-third interest in WPT, as did an entity owned by Wayne Prim (Prim). Blixseth's role as manager of WPT did not change when Dolan's and Prim's entities acquired their two-thirds ownership interest in WPT. The second ownership change occurred in 2012, when Blixseth's ownership shares in WPT were acquired by an entity owned by Prim. After this change, Blixseth no longer had any ownership interest in or managerial responsibility for WPT.

2. <u>Negotiations between Hawes and Blixseth. Hawes begins his employment.</u>

In 2005, Hawes practiced law at Elam & Burke, a Boise law firm. At the time, Blixseth and his wife Edra were co-owners of BGI. Blixseth was also the sole owner of WPT, an LLC organized under the laws of Oregon.

In January 2005, Blixseth retained Elam & Burke to perform legal services, including drafting and filing documents to register WPT to enable it to conduct business in Idaho.[2] As Elam & Burke's real estate specialist, Hawes performed this work for WPT between January and June 2005. Hawes was listed as WPT's registered agent on its application for registration as a foreign limited liability company, which was filed with the Idaho Secretary of State in February 2005.

Hawes claimed that in June 2005, Blixseth contacted him and asked if he would be interested in leaving Elam & Burke and working full-time for Blixseth as general counsel of WPT. Hawes contends that after negotiation on employment terms, Hawes agreed to work for WPT. According to Hawes, this agreement was reached during a dinner meeting with Blixseth in downtown Boise in June 2005. Hawes testified that Blixseth hired him to work primarily for WPT, but that "from time to time" he would do "other projects for other entities [Blixseth] owned."

---

[2] WPT was in the process of purchasing Boise Cascade's timberlands and needed to be licensed to do business in Idaho.

Hawes' chief hesitation with the offer was that the salary presented by Blixseth was roughly equivalent to what he anticipated earning at Elam & Burke, and that in moving to an in-house position he would be leaving behind a more lucrative long-term opportunity at Elam & Burke. As a result, Hawes negotiated terms that would compensate him for the risk he would be undertaking by accepting Blixseth's offer. Hawes also wanted to ensure that he could continue to work as a commissioner for the Idaho State Bar (ISB). Hawes stated that Blixseth's response was to offer an annual salary of $100,000, and that Hawes would be free to continue his commissioner work. Blixseth also offered a severance package commensurate with the amount of time Hawes worked for Blixseth. Hawes testified that this severance package would provide Hawes with $100,000 for each year worked, capped at a total of 5 years, or $500,000. When asked by Blixseth if he "was in," Hawes said he agreed to these terms and shook hands with Blixseth.[3]

On July 8, 2005, Hawes sent a follow-up email to Blixseth, attaching an outline that detailed the employment terms regarding the severance agreement and Hawes' ability to continue his work as an ISB commissioner. Blixseth cryptically replied that he would "take a look," but apparently did not directly respond further to this email. Three days later, on July 11, 2005, Hawes emailed an employment agreement to Blixseth. This employment agreement lists the "Blixseth Group and its affiliates" as his employer. The agreement contained the same terms with respect to severance and added a 30-day written notice requirement for termination of the employment relationship. A series of emails between July 11 and 18 detailed Blixseth's attempt to have this agreement faxed to his Montana residence, as well as an additional discussion about how often Hawes would be paid.

On July 21, 2005, Hawes signed an Employment Application/At-Will Employee Statement listing his employer as "Blixseth Company" and alternately "Blixseth Group Porcupine Creek." The document contained a term stating that there were no additional employment agreements; however, Hawes made a handwritten and initialed annotation on the document by this term, stating "Subject to that certain employment agreement by and between Mr. Blixseth and Mr. Hawes relating to certain terms and conditions of employment." He emailed this signed agreement to Patrick Ratte (Ratte), controller for BGI and its affiliated entities, with an explanation that the

---

[3] In the subsequent email discussion regarding the proposed employment agreement, Hawes' official start date was to be August 1, 2005, to give him time to wrap up work for his other clients at Elam & Burke. However, Hawes also testified that he began work for Blixseth on a particular transaction the next day—namely, purchase of the Lochsa lands.

4

additional employment agreement had been separately negotiated with Blixseth. Ratte's response was that the notation was "fine."[4]

Hawes claimed that thereafter he worked for WPT as its in-house general counsel. He testified that his business cards listed "Western Pacific Timber" as his employer. At times he would do limited projects for other Blixseth entities, such as YCW or BGI. However, Hawes testified that over his entire tenure "99 percent of [his] work was with Western Pacific Timber." He conceded that between 2005 and 2007, the amount was closer to "90 percent."

In contrast to Hawes' recitation of events, WPT maintained that Hawes was actually hired by and became an employee of *BGI* upon his hiring, and pointed to work Hawes performed for YCW and other Blixseth-related entities in the early years of his employment. In particular, Hawes testified on cross-examination that he had traveled internationally to work for YCW between 2005 and 2007.

In 2006, as explained above, ownership of WPT changed. Previously, Blixseth owned WPT in its entirety; after 2006, Blixseth retained only a one-third interest in WPT. Two-thirds of WPT was controlled by entities owned by Dolan and Prim. However, as Hawes described it, Blixseth continued to manage WPT, with Dolan and Prim acting as "silent partners."

3. <u>Hawes relocates to Portland, BGI becomes BGW, and Hawes returns to Boise.</u>

In 2007, BGI continued to administer human resources and payroll functions for WPT. However, a significant portion of WPT's timber property in Idaho was sold. This sale eliminated the need for WPT to maintain a presence in Idaho. As a result, other WPT employees in Idaho were discharged. However, WPT had just opened an office in Portland, Oregon, and Hawes was asked to transfer with his paralegal to the new Portland location. Hawes and his family moved to Portland in early 2008, and continued working in the same role for WPT as general counsel, this time with respect to the Washington properties.

During this time, the Blixseths divorced and their assets were divided. As part of the divorce, BGI was dissolved. In its place, Blixseth created Blixseth Group Washington, Inc. (BGW), a company which was owned solely by Blixseth. In September 2009, Hawes completed an employment application with BGW, noting that he was transferring from BGI to BGW but

---

[4] Ratte managed much of Blixseth's day-to-day communications. When Blixseth ceased to be a manager at WPT, Ratte's employment was terminated by the new owners. Ratte declined to come to Idaho for trial in this case. His testimony was instead presented via a video deposition which was recorded and then played at trial.

continuing to work as general counsel for WPT. This application again contained an at-will employee statement, to which Hawes again added an initialed annotation—materially identical to that on the BGI application—stating, "Subject to that certain employment agreement by and between Tim Blixseth and Andy Hawes relating to certain terms and conditions of employment." This application was also signed by Carolyn Wheeler, Blixseth's sister who had worked for BGI, managed human resources for WPT, and transferred her employment to BGW after its creation.

For a few months in 2009, BGW continued to perform the payroll function for WPT. However, by the end of 2009, WPT began conducting its own payroll functions so that Hawes received his paychecks not from BGW, but from WPT itself. This "transfer" of employment from BGW to WPT was also reflected in Hawes' retirement account and health insurance. While Hawes' W-2s prior to 2009 listed either BGI or BGW as his employer, after 2009, WPT was the listed employer on Hawes' paychecks and his W-2s. WPT contended that this transfer of employment in 2009 constituted the termination of Hawes' employment by BGW and his hiring by WPT.

According to Hawes, in 2010, WPT's focus returned to the Lochsa lands and the potential for a land exchange with the USFS. WPT requested that Hawes return to Boise to reopen its office there, so Hawes and his family moved to Boise, Idaho, in the summer of 2010.

4. Blixseth's ownership interest in WPT is terminated.

In 2012, a major transition occurred in WPT's ownership and management, leaving the company entirely disassociated from Blixseth. In 2009, Blixseth substituted an entity owned by him—Desert Ranch, LLLP (Desert Ranch)—as member and manager of WPT. According to Hawes, Blixseth borrowed money from Prim, using Desert Ranch's shares in WPT as collateral for the loan. When Blixseth defaulted on the loan in 2012, Desert Ranch's shares were transferred to Prim's entity pursuant to a membership pledge agreement and collateral assignment, and neither Blixseth nor Desert Ranch retained any management responsibility or ownership interest in WPT. This series of events was the subject of unrelated litigation, which was ultimately resolved when Blixseth conceded that he was no longer the manager of WPT. Following this concession, Prim and Dolan became co-managers of WPT, with Prim owning two-thirds and Dolan one-third of the company through other entities.[5] Blixseth was no longer an owner or manager of WPT.

---

[5] Prim held his WPT shares in 395 Lampe, LLC, and Kingsberry Timber, LLC. Dolan's holding company was Voyager II.

According to Dolan, the protracted litigation over the termination of Blixseth's involvement in WPT left several questions, first among them being who should remain an employee of WPT, given the original entanglement between Blixseth's and WPT's operations. Several employees, including Ratte and Wheeler, had their employment terminated. All of WPT's personnel files had to be moved from BGW's offices to WPT's. In addition, Dolan was concerned about "who was on the team and who wasn't on the team." According to Dolan, he asked Hawes to "tell [him] everything [he] need[ed] to know" about WPT because Prim wanted to fire Hawes. Hawes did not inform Dolan or Prim about the existence of the severance agreement.

After Blixseth's management of WPT was ended, Hawes took on more managerial responsibilities at the company between 2012 and 2017. He spent significant time on the Lochsa lands exchange. Over time, however, the land exchange became more complicated than expected, requiring congressional lobbying in Washington, D.C. In addition, there was significant public pushback regarding the proposal. By the end of 2016, the Lochsa lands exchange was "dead."

5. WPT fires Hawes in 2017.

According to Doug Hein (Hein), the CFO of Voyager II (Dolan's holding company), both Prim and Dolan were concerned about WPT's financial solvency beginning in 2015. In addition, Prim and Dolan concluded that the Lochsa lands exchange was unlikely to ever come to fruition. On December 16, 2016, a telephone conference was held, which included Prim, Dolan, and other executive officers from the entities with ownership interests in WPT. A decision was made to eliminate WPT's in-house legal department, which at the time consisted of Hawes and the paralegal he had hired in 2005.

Hein informed Hawes of WPT's decision January 10, 2017.[6] The termination of Hawes' employment was effective immediately. Hawes was offered a severance agreement of three month's salary and a retainer for an additional six months of legal consulting.

Hawes informed Hein that he had a separate severance agreement with WPT, which should be in his personnel file. After the meeting, Hein requested that Lightner look through Hawes' personnel file for the employment agreement. Lightner found "a draft-like agreement between

---

[6] This was an in-person meeting in Boise that Hawes believed would cover only the budget for fiscal year 2017. Also present was John Lightner (Lightner), who served as WPT's controller between 2005 and 2007, and then again from 2012 forward.

7

[Hawes] and BGI." This agreement was unsigned and detailed the severance terms Hawes had asserted: $100,000 for each year of employment, capped at five years, or $500,000.

WPT refused Hawes' demanded severance pay.

**B. Procedural History.**

1. Complaint filed; discovery and cross-motions for summary judgment.

Hawes filed suit against WPT on July 5, 2017, alleging breach of contract and demanding the severance pay he claimed he was owed. WPT answered also filing a counterclaim for breach of confidentiality and breach of fiduciary duty.

After conducting extensive discovery, the parties filed cross-motions for summary judgment. After the parties presented oral argument, the district court ruled from the bench, granting in part WPT's motion for summary judgment on the breach of a *written* contract claim. This was granted because Hawes could not produce a signed written agreement. However, the district court denied WPT's summary judgment motion to the extent that there was a genuine issue of material fact as to the existence of an *oral* agreement between the parties that had purportedly been breached. The district court concluded that it was in the jury's province to determine the terms of the alleged oral contract, if in fact one existed.

2. Jury trial; motion for directed verdict; the jury's verdict.

The jury trial was conducted over five days between April 29 and May 3, 2019. By this time, WPT's breach of confidentiality claim had been abandoned pursuant to a stipulation of the parties. In response to Hawes' breach of contract claim, WPT continued to assert the affirmative defense of equitable estoppel, arguing that Hawes breached a duty to reveal the terms of his alleged severance agreement. WPT also continued to assert its counterclaim of breach of fiduciary duty.

At the close of Hawes' case, WPT moved for a directed verdict on the breach of contract claim on the basis that Hawes had failed to present substantial evidence that he and Blixseth had a meeting of the minds and reached an agreement on the severance terms that would bind WPT. The district court denied this motion.

Two hours after the jury retired to begin its deliberations, the jury sent the following note to the trial judge: "What is the legal point at which a company or entity becomes a persons' [sic] employer?" Discussion was held between counsel and the trial judge in crafting an answer. The answer the trial judge ultimately read to the jury was: "The legal point of employment is when the parties agree."

8

The jury returned a verdict soon after,[7] finding that Blixseth, on behalf of WPT, had entered into an oral agreement with Hawes for severance pay in 2005. The jury determined that Hawes had suffered damages in the amount of $500,000. The jury also determined that WPT had failed to prove its affirmative defense of equitable estoppel, or its counterclaim for breach of fiduciary duty.

3. Entry of judgment; motion for new trial; attorney fee dispute.

On May 9, 2019, the district court trebled the jury's award (pursuant to Idaho Code section 45-615(2)), added prejudgment interest, and entered judgment against WPT in the amount of $1,639,726.80. The district court's judgment did not include attorney fees or costs as those issues remained unresolved. Hawes later requested costs and attorney fees under Idaho Code section 49-615 and Idaho Rule of Civil Procedure 54(d)(1), seeking attorney fees in the amount of 35% of the total damages award, or $573,904.38. WPT opposed this request, arguing that an award of attorney fees in this amount would constitute an unreasonable windfall to Hawes and punish WPT too harshly. After extensive briefing by the parties, the district court granted Hawes' request for attorney fees and costs.

WPT moved for a new trial. This motion was denied in a ruling from the bench at the hearing.

WPT filed its original notice of appeal seeking relief from the judgment entered. After the district court entered a second judgment adding the attorney fees and costs awarded by the court, WPT filed an amended notice of appeal which included the award of attorney fees and costs as an issue on appeal.

## II. ANALYSIS

**A. The district court did not err in denying WPT's motion for a directed verdict.**

1. Standard of Review.

"In determining whether a directed verdict or judgment n.o.v. should have been granted, the appellate court applies the same standard as does the trial court which passed on the motion originally." *Thurston Enterprises, Inc. v. Safeguard Bus. Sys., Inc.*, 164 Idaho 709, 716, 435 P.3d 489, 496 (2019) (quoting *Quick v. Crane*, 111 Idaho 759, 764, 727 P.2d 1187, 1192 (1986)).

> When a trial judge receives such a motion, the judge begins the inquiry by asking him or herself whether there is substantial evidence in the record upon which

---

[7] WPT has characterized this time period as "minutes later." However, it is not possible to tell from the transcript itself how much time elapsed between the trial judge answering the jury's question and the jury rendering its verdict.

the jury could properly find a verdict for the party against whom the judgment notwithstanding the verdict is sought. *See Quick*[, 111 Idaho at 763, 727 P.2d at 1191]. The judge's task in answering this question is to review all the evidence and draw all the reasonable inferences therefrom in the light most favorable to the non-moving party. *Id*. at 764, 727 P.2d at 1192. (The party seeking a judgment notwithstanding the verdict admits the truth of all the other side's evidence and every legitimate inference that can be drawn from it. *Stephens v. Stearns*, 106 Idaho 249, 252–53, 678 P.2d 41, 44–45 (1984).) The judge is not an extra juror, though; there is no weighing of evidence or passing on the credibility of witnesses or making of independent findings on factual issues. *Gmeiner v. Yacte*, 100 Idaho 1, 4, 592 P.2d 57, 60 (1979). Instead, the judge must determine whether the evidence is substantial—that is, whether it is of sufficient quality and probative value that reasonable minds could arrive at the same conclusion as did the jury. *Mann v. Safeway Stores, Inc*., 95 Idaho 732, 736, 518 P.2d 1194, 1198 (1974).

*Thurston Enterprises, Inc.*, 164 Idaho at 716–17, 435 P.3d at 496–97 (2019) (quoting *Schwan's Sales Enterprises, Inc. v. Idaho Transp. Dep't*, 142 Idaho 826, 830, 136 P.3d 297, 301 (2006)).

2. Discussion.

Following the close of Hawes' evidence, WPT moved the district court for a directed verdict, claiming that there was insufficient evidence to submit Hawes' claim of an oral severance agreement to the jury.[8] In particular, WPT argued that there was insufficient evidence that Hawes and Blixseth had come to a meeting of the minds on the $500,000 severance term that would bind WPT.

In response, Hawes asserted that there was "abundant evidence in the record" to establish a meeting of the minds on the essential terms of Hawes' severance agreement with WPT. The district court agreed, denying WPT's motion and concluding that there was sufficient "evidence that the parties reached a specific agreement orally as to the duration of time and the amount of compensation in the event that there was a termination of employment."

On appeal, WPT details Hawes' evidence on the issue of the alleged severance agreement, arguing that Hawes' showing was insufficient to demonstrate that Hawes and Blixseth had a "meeting of the minds" regarding Hawes' severance agreement. Hawes contends that WPT's argument does not fairly address the standard applicable to ruling on a motion for directed verdict.

---

[8] The briefing on this motion has not been included in the record on appeal. Consequently, the only argument available for this Court to review is what was argued at trial. *See Gibson v. Ada Cnty.*, 138 Idaho 787, 790, 69 P.3d 1048, 1051 (2003) ("When a party appealing an issue presents an incomplete record, this Court will presume that the absent portion supports the findings of the district court.").

10

Hawes further argues that "the standard in ruling on the directed verdict motion requires accepting [the non-moving party's] testimony as true."

The crux of a motion for a directed verdict is the movant's argument that the non-movant's evidence is insufficient to justify even submitting the claim to the jury. *Irish v. Hall*, 163 Idaho 603, 607, 416 P.3d 975, 979 (2018). "A directed verdict is proper only where the evidence is so clear that all reasonable minds could reach only one conclusion: that the moving party should prevail." *Student Loan Fund of Idaho, Inc. v. Duerner*, 131 Idaho 45, 51, 951 P.2d 1272, 1278 (1997). The evidence presented by the non-movant does not need to be "uncontradicted" for the non-movant to prevail, requiring "only that it be of sufficient quantity and probative value that *reasonable minds could conclude* that a verdict in favor of the [non-movant] is proper." *Irish*, 163 Idaho at 607, 416 P.3d at 979 (italics added) (quotation omitted).

The district court did not err in denying WPT's motion for a directed verdict. WPT's arguments focus entirely on the "meeting of the minds" element of an oral contract's formation, arguing that there was insufficient evidence to establish that the agreement had been reached *on WPT's behalf*. Hawes put forward the following evidence to establish that an agreement had been reached:

- Hawes' testimony about his negotiations with Blixseth at the June 2005 dinner meeting;
- Emails between Hawes, Blixseth, and Ratte that include further discussion about the terms of Hawes' employment as well as Ratte's confirmation that Hawes' notation on the at-will employment agreement was "fine";
- Testimony by Ratte corroborating that any notation on employment forms would have to have been approved by Blixseth and HR;
- A copy of the unsigned employment and severance agreement in Hawes' personnel file;
- Testimony by WPT's controller Lightner that this agreement, although unsigned, was located where Hawes said it would be; and
- Hawes' testimony that it was reasonable for him to demand and receive a severance agreement given that he would be giving up a lucrative partnership in a law firm and needed some financial security to entice him to make the change.

11

Hawes put forward the following evidence to establish that the agreement had been reached *on WPT's behalf*:

- Hawes' testimony that Blixseth's intention was to hire him as in-house counsel for WPT;

- An email from Ratte stating that all "BGI employees, *including the folks at WPT*[,] are on a bi-weekly payroll" (italics added);

- Ratte's testimony that he understood Hawes had been hired to work for WPT, and that Hawes was an employee of WPT;

- Lightner's testimony that he understood Hawes was general counsel for WPT at all times;

- Hawes' business cards listing him as in-house counsel for WPT; and

- Hawes' testimony that an overwhelming majority of his work was conducted for WPT.

Hawes' evidence did not need to be undisputed for the district judge to deny the motion for a directed verdict. *Irish*, 163 Idaho at 607, 416 P.3d at 979. Taking all legitimate inferences in favor of Hawes, there was sufficient evidence to submit the claim of breach of an oral contract to the jury. Hawes' evidence was of sufficient quantity and probative value that reasonable minds *could* determine that Hawes and Blixseth (on WPT's behalf) came to an agreement in 2005 regarding Hawes' severance terms. Consequently, the district court did not err in denying WPT's motion for a directed verdict.

**B. The jury's finding that an oral agreement had been formed in 2005 between Hawes and Blixseth on WPT's behalf is supported by substantial and competent evidence.**

1. Standard of Review.

> "This Court will not set aside a jury verdict on appeal if it is supported by substantial and competent evidence." *Van v. Portneuf Med. Ctr., Inc.*, 156 Idaho 696, 700, 330 P.3d 1054, 1058 (2014). "[W]hen reviewing a jury verdict on appeal the evidence adduced at trial is construed in a light most favorable to the party who prevailed at trial." *Id.* (quoting *Garrett Freightlines, Inc. v. Bannock Paving Co., Inc.*, 112 Idaho 722, 726, 735 P.2d 1033, 1037 (1987)).

*Ballard v. Kerr*, 160 Idaho 674, 686, 378 P.3d 464, 476 (2016). "This Court will not second guess the jury's determinations as to the weight of the evidence and witness credibility." *Id.* (citation omitted).

2. Discussion.

Hawes' complaint survived summary judgment because the district court determined that a genuine issue of material fact remained as to the existence and terms of an oral contract between WPT and Hawes. The claimed breach of oral contract went to trial, and the jury determined that an oral agreement regarding severance had been reached in 2005 between WPT and Hawes.

On appeal, WPT has attacked the jury's special verdict that an oral severance agreement was created in 2005. WPT argues that "no reasonable jury should have found there was a sufficient meeting of the minds" because Hawes' subsequent emails to Blixseth proposed different terms in the weeks following. WPT also argues that Hawes' evidence did not establish that any such agreement was binding on WPT.

Hawes responds by reiterating the showing needed to disturb the jury's verdict. Hawes points to additional evidence *other* than his own testimony as supporting a meeting of the minds, such as the emails following his dinner with Blixseth, and the deposition testimony of Ratte, who approved Hawes' notation on his employment form. Hawes also argues that the subsequent emails do not change the three essential terms agreed upon at the dinner meeting—salary, severance, and Hawes' continued ability to work as an ISB Commissioner.

WPT counters, arguing that the evidence Hawes contends supports the jury verdict is neither competent nor substantial. WPT's attack on the competency of the evidence is a return to its argument that Hawes should not have been permitted to testify about Blixseth's statements without laying a proper foundation that Blixseth was an agent of (and speaking for) a party-opponent. WPT continues to argue that Hawes' challenged testimony was the only evidence establishing than an oral severance agreement had been reached. WPT further contends that there is "no evidence" other than Hawes' testimony to show "that Blixseth was acting on behalf of WPT in hiring Hawes or making any agreement concerning severance." (Emphasis in original). WPT argues that Hawes' work with other Blixseth-affiliated entities cuts against the assertion that the severance agreement was intended to bind WPT.

There are two inquiries presented by this argument: (1) whether substantial and competent evidence supports a finding that an agreement was reached in 2005; and (2) whether substantial and competent evidence supports a finding that this agreement, if reached, was binding on WPT as opposed to some other entity.

13

a. *The subsequent emails concerning other employment terms do not render the jury's special verdict unsupported by substantial and competent evidence.*

A contract requires mutual assent. *Gray v. Tri–Way Const. Servs., Inc.*, 147 Idaho 378, 384, 210 P.3d 63, 69 (2009). This requires "[a] distinct understanding common to both parties" to exist. *Id.* Therefore, mutual assent or a "meeting of the minds" must occur on every material term in the contract. *Barry v. Pac. W. Const., Inc.*, 140 Idaho 827, 831, 103 P.3d 440, 444 (2004).

*Bremer, LLC v. E. Greenacres Irrigation Dist.*, 155 Idaho 736, 741, 316 P.3d 652, 657 (2013). "If terms necessary to a contract are left for future negotiation, the contract cannot be enforced." *Dursteler v. Dursteler*, 108 Idaho 230, 234, 697 P.2d 1244, 1248 (Ct. App. 1985) (citing *Brothers v. Arave*, 67 Idaho 171, 174 P.2d 202 (1946)).

The thrust of WPT's argument is that the emails Hawes sent after the June 2005 meeting contained such divergent employment terms that Hawes and Blixseth could not have come to a "meeting of the minds" about the terms of employment (particularly, severance) at their meeting. This argument is unpersuasive. A reasonable jury could find that these emails did not constitute negotiation about *material* terms to the employment contract, but rather constituted confirmation of the terms already negotiated, and addition of less necessary terms, i.e., "some items that we [Hawes and Blixseth] didn't touch upon[,]" specifically employee benefits and insurance. Hawes testified that he used a boilerplate employment agreement form but modified it to include the three essential terms he and Blixseth had agreed to at the dinner meeting. These three terms—salary, severance, and his ability to continue work as an ISB commissioner—were not in dispute; instead, the only term that necessitated change was the payment schedule. Further, based on the tone of the emails and Ratte's additional testimony about the exchange, a jury could reasonably conclude that the agreement had *already* been reached.

While it is true that the *clearest* evidence of Blixseth's agreement is Hawes' testimony, the district court determined that proper foundation had been laid in order to admit Hawes' testimony as to Blixseth's statements as an admission of a party-opponent. The jury weighed Hawes' credibility and found his testimony convincing. On appeal, this Court does not "second guess the jury's determinations as to the weight of the evidence and witness credibility." *Ballard*, 160 Idaho at 686, 378 P.3d at 476. Instead, when this Court reviews a jury verdict on appeal, we construe "the evidence adduced at trial . . . in a light most favorable to" the party who prevailed at trial. *Id.* Substantial and competent evidence supports the jury's finding that the severance agreement was reached at the 2005 meeting.

14

*b. Substantial and competent evidence supports the jury's special verdict that the severance agreement had been reached between Hawes and Blixseth on behalf of WPT.*

WPT's attack on the jury verdict is based on its contention that any agreement reached between Hawes and Blixseth was not binding on WPT. In support of its argument, WPT points to evidence that Hawes did work for Blixseth-affiliated entities other than WPT in the first few years of employment. It also points to various documents indicating that Hawes was employed by BGI and BGW before his employment by WPT.

In its special verdict, the jury determined that the severance agreement had been reached between Hawes and Blixseth on WPT's behalf. In support of this determination, Hawes presented substantial evidence, as detailed above, to support this conclusion. WPT challenges this evidence arguing that Hawes performed work for and was paid by other Blixseth-affiliated entities at the beginning of his employment when whatever agreement between them had been reached.

Substantial and competent evidence supports the jury's special verdict that the severance agreement had been reached by Hawes and WPT. The jury apparently believed Hawes' testimony that notwithstanding the multiplicity of entities owned and managed by Blixseth, the vast majority of the work Hawes performed was *for* WPT and that from the inception of his employment he was employed *by* WPT. Consequently, if the jury found Hawes' admissible testimony credible, a reasonable jury could conclude that Hawes' testimony *explained* the prevalence of the references to BGI and BGW in his personnel file and financial records, instead of *contradicting* the involvement of BGI and BGW in WPT business operations. The jury must have found Hawes credible. This Court has long-standing reluctance to "second guess the jury's determinations as to the weight of the evidence and witness credibility." *Ballard*, 160 Idaho at 686, 378 P.3d at 476. Although Hawes' testimony at trial did not go unchallenged, his testimony explained and overcame WPT's opposing evidence. This Court affirms the jury's verdict as supported by substantial and competent evidence on the formation of an oral agreement regarding severance which would bind WPT.

**C. Substantial and competent evidence supports the jury's finding that WPT did not establish its affirmative defense of equitable estoppel.**

1. Standard of Review.

"This Court will not set aside a jury verdict on appeal if it is supported by substantial and competent evidence." *Ballard*, 160 Idaho at 686, 378 P.3d at 476 (quoting *Van*, 156 Idaho at 700,

15

330 P.3d at 1058. "This Court will not second guess the jury's determinations as to the weight of the evidence and witness credibility." *Id.* (citation omitted).

2. Discussion.

At trial, WPT sought to establish the affirmative defense of equitable estoppel, contending that Hawes had breached a duty to reveal the alleged severance agreement when Dolan had asked Hawes to tell him everything he needed to know about WPT, and Hawes did not mention his severance agreement. Hawes argued that there was no need to talk about the severance agreement in 2012 and that there was certainly no duty to reveal an agreement he believed his employer had placed in his personnel file. The issue was presented to the jury, which rejected WPT's affirmative defense.

On appeal, WPT argues that there was substantial and competent evidence such that the jury should have found that WPT had established its affirmative defense of equitable estoppel. WPT argues that Hawes intended to conceal the severance agreement from WPT's new owners after Blixseth's involvement was terminated in 2012. WPT contends Hawes succeeded in keeping the agreement secret because WPT's owners and managers were unaware of the agreement "and had no way of discovering [its] existence[.]" WPT further contends that it relied on this concealment "to its prejudice" when Hawes was asked to disclose any potential conflicts he had related to Blixseth; WPT contends that after this disclosure, Prim and Dolan decided not to fire Hawes and instead continued to employ him. WPT argues that "Hawes should not be allowed to now take an inconsistent position to his advantage."

> In order to obtain equitable estoppel, a party must show:
>
> (1) a false representation or concealment of a material fact made with actual or constructive knowledge of the truth; (2) that the party asserting estoppel did not and could not have discovered the truth; (3) an intent that the misrepresentation or concealment be relied upon; and (4) that the party asserting estoppel relied on the misrepresentation or concealment to his or her prejudice.

*Weitz v. Green*, 148 Idaho 851, 861, 230 P.3d 743, 753 (2010) (quoting *Willig v. State, Dep't of Health & Welfare*, 127 Idaho 259, 261, 899 P.2d 969, 971 (1995)).

Substantial and competent evidence supports the jury's determination that WPT failed to prove its affirmative defense of equitable estoppel. First, the evidence WPT presented to suggest that Hawes intended to conceal the severance agreement from Prim and Dolan was hardly substantial. Although Hawes admits he never told Prim or Dolan about the severance agreement he had entered into with Blixseth, he also testified that he was never asked about it. The presence

16

of the unsigned employment agreement in Hawes' personnel file—a file in the possession of WPT, not Hawes—also cuts against WPT's contention that Hawes intended to keep the severance terms a secret, or that WPT could not have discovered its existence.

Further, the jury could have reasonably concluded that WPT did not rely on its lack of knowledge about the severance terms to its prejudice. WPT has not alleged any prejudice beyond continuing to pay Hawes his salary between 2012 and 2017. WPT argues that had it known about the severance agreement, it would have fired Hawes in 2012. However, equitable estoppel is an affirmative defense: "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." *Kenworth Sales Co. v. Skinner Trucking, Inc.*, 165 Idaho 938, 943, 454 P.3d 580, 585 (2019) (quoting *Affirmative Defense*, BLACK'S LAW DICTIONARY (11th ed. 2019)). Taking Hawes' allegation as true that this severance agreement existed with WPT, the terms of the severance agreement would have fully vested by 2010. WPT would have been required to pay Hawes his full severance if it had fired Hawes in 2012. At its base, WPT's position is that it would like a second opportunity to prove an affirmative defense it failed to prove at trial. We are disinclined to grant such a request. As a result, this Court affirms the jury's special verdict that WPT failed to establish its affirmative defense of equitable estoppel.

**D. The district court did not abuse its discretion in allowing Hawes to testify about Blixseth's statements during their negotiations of Hawes' employment agreement.**

1.  Standard of Review.

"This Court reviews challenges to the district court's evidentiary rulings under the abuse of discretion standard." *Phillips v. E. Idaho Health Servs., Inc.*, 166 Idaho 731, 741, 463 P.3d 365, 375 (2020) (citation omitted).

> When this Court reviews for an abuse of discretion, this Court determines "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason."

*Id.* (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)).

2.  Discussion.

To establish the existence of an oral agreement, Hawes testified about his conversation with Blixseth. WPT objected to Hawes' testimony recounting Blixseth's statements, arguing that this testimony constituted inadmissible hearsay. Hawes responded, arguing that Blixseth, as the

sole member of WPT at the time, was speaking for WPT, a party-opponent under Idaho Rule of Evidence 801(d)(2)(D). The district court overruled these objections, permitting Hawes to testify about Blixseth's statements with respect to WPT. In overruling WPT's objection the district court added, "[a]s far as interest in other companies [than WPT], that's subject to cross-examination and to additional evidence as to whether this was a conversation limited to [WPT] or whether it was broader or whether it had any meaning in that context."

On appeal, WPT sets forth the same argument contending that Hawes' testimony constituted inadmissible hearsay. WPT maintains that Hawes set forth no independent evidence of an agency relationship between Blixseth and WPT such that Blixseth's statements during the June 2005 dinner meeting could bind WPT. WPT also argues that this ruling was "particularly prejudicial and egregious given that Hawes' testimony [was] the only evidence offered at trial concerning an oral agreement binding upon WPT that resulted in a multi-million dollar judgment against WPT." (Emphasis in original.)

Hawes responds, observing that it was "undisputed that [Blixseth] was the sole owner of WPT in 2005 when the severance agreement was reached." Hawes also points to the work Hawes had done for Blixseth and WPT between January and June 2005, arguing that this provided Hawes with "a wealth of experience working for WPT only through [Blixseth] as its sole owner and agent prior to the dinner meeting in June 2005."

WPT argues that Blixseth's status as sole owner of WPT is immaterial because Blixseth "also was the owner of multiple other entities in 2005, including BGI and YCW, for which Hawes acted as general counsel." (Emphasis in original.) WPT argues that "if the Court were to apply Hawes' argument, any employer that owns multiple affiliated entities could risk liability for all entities based on an oral agreement only intended to bind a particular entity." WPT frames Hawes' testimony about the June 2005 dinner as "self-serving and uncorroborated[.]"

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted, and is generally not admissible. *See* I.R.E. 801(c), 802. However, statements made by and offered against a party-opponent do not constitute hearsay. *See* I.R.E. 801(d)(2). A statement can qualify as having been made by the party-opponent if the statement "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]" I.R.E. 801(d)(2)(D).

18

The district court did not abuse its discretion in allowing Hawes to testify about Blixseth's statements at the June 2005 dinner meeting. There is independent evidence in the record that Blixseth was speaking on behalf of WPT when negotiating with Hawes on the terms of his employment. First, as noted, both Ratte, the former controller of BGI, and Lightner, WPT's controller at the time Hawes was hired and then again when he was fired, testified that they thought Hawes had been employed by WPT during his tenure. Second, Blixseth undisputedly had the power to bind WPT at the time; WPT has not disputed that in 2005, Blixseth was WPT's owner and sole member. Third, there is significant evidence that Blixseth's intention in hiring Hawes was so that he could continue the work he had done earlier in 2005 *for* WPT. In particular, Hawes filed the paperwork required for WPT to conduct business in Idaho, negotiated the purchase of several key WPT properties, and was identified as WPT's registered agent. Finally, despite WPT's dispute about who Hawes worked for in the next twelve years, Hawes testified that nearly all of his work was conducted for WPT, beginning as soon as the day after the meeting.

Blixseth's *status* as the sole member of WPT established his capacity to bind WPT in the way the jury found he had. While it may be true that Hawes' testimony was "self-serving," that is not a basis upon which to reject his testimony. If testimony could be rejected on this basis, the testimony of almost any party containing otherwise admissible testimony would suddenly become inadmissible.[9] Likewise, WPT's claim that Hawes' testimony is "uncorroborated" is simply not supported by this record. WPT's real complaint appears to be that it had no way to contradict Hawes because Blixseth was nowhere to be found and therefore unavailable to testify. However, despite significant obstacles to pursuing his case, Hawes overcame them. These obstacles were noted by Senior District Judge Gerald Schroeder, who served as the trial judge. As he observed in his order on attorney fees and costs, "[a]t the outset this court saw little likelihood that the plaintiff could prevail. However, as the trial progressed and the threats of public humiliation diminished and the comparative integrity and credibility of the witnesses evolved, the balance shifted, as evidenced by the jury verdict." For the reasons stated, the district court did not abuse its discretion in allowing Hawes to testify regarding Blixseth's statements during the June 2005 dinner meeting.

---

[9] Further, attacking the testimony of a party as "self-serving" is more akin to impeaching a witness for bias, which ultimately goes to the *weight* of the testimony, not its admissibility. More importantly, the hearsay rules do not provide that an admission of a party is hearsay merely because the party testifying about the statement has an interest in the outcome. By definition, virtually any admission of a party opponent is offered because the offering party is attempting to support his position.

**E. WPT did not object to the jury instruction given in response to the jury's question.**

　　1. Standard of Review.

"This Court reviews the grant or denial of a motion for new trial based on an abuse of discretion standard." *Gillingham Const., Inc. v. Newby-Wiggins Const., Inc.*, 142 Idaho 15, 23, 121 P.3d 946, 954 (2005).

> "The propriety of jury instructions is a question of law over which this Court exercises free review, and the standard of review of whether a jury instruction should or should not have been given is whether there is evidence at trial to support the instruction, and whether the instruction is a correct statement of the law." *Clark v. Klein*, 137 Idaho 154, 156, 45 P.3d 810, 812 (2002) (internal citations omitted). This Court reviews jury instructions as a whole to determine whether the instructions fairly and adequately present the issues and state the law. *Silver Creek Computers, Inc. v. Petra, Inc.*, 136 Idaho 879, 882, 42 P.3d 672, 675 (2002). Even where an instruction is erroneous, the error is not reversible unless the jury instructions taken as a whole mislead or prejudice a party. *Id.*

*Mackay v. Four Rivers Packing Co.*, 151 Idaho 388, 391, 257 P.3d 755, 758 (2011). This Court "will not hold that a trial court erred in making a decision on an issue or a party's position on an issue that it did not have the opportunity to address." *Eagle Springs Homeowners Ass'n, Inc. v. Rodina*, 165 Idaho 862, 869, 454 P.3d 504, 511 (2019) (quotation omitted).

　　2. Discussion.

During the jury's deliberations, the district court received an inquiry from the presiding juror, asking: "What is the legal point of employment?" The district court and counsel for both parties worked together in crafting an answer: "The legal point of employment is when the parties agree." This answer was returned to the jury after the following exchange between the district court and counsel:

> THE COURT: On the record.
> Here's what we have. A question has been submitted by the jury: What is the legal point at which a company or entity becomes a person's employer?
> Answer: The legal point of employment is when the parties agree.
> Any objection?
> [Hawes' counsel]: We'll accept that, your Honor.
> [WPT's counsel]: Yes, your Honor.

After all the jury's questions had been answered,[10] the jury returned, finding that Hawes and Blixseth, on behalf of WPT, entered into an oral severance agreement in 2005.

---

[10] While the jury also asked other questions, this was the only answer identified by WPT as objectionable.

WPT filed a motion for a new trial, arguing that it had objected to the district court's answer given to the jury's question. In particular, WPT contended that the instruction was "both factually and legally incorrect, incomplete and highly prejudicial to WPT[.]" WPT argued that it had objected to this answer "because the parties had not had the opportunity to research the question[.]" WPT also asserted that legally, the point of Hawes' employment was when he completed his employment application and other preliminary employment requirements. Hawes countered by first arguing that WPT had not objected to this jury instruction, and second contending that the jury instruction was legally correct.

The district court denied this motion, ruling from the bench at a hearing, as follows:

It was indicated the question of whether there was a waiver probably doesn't depend on what's in my head, it depends on what the record says. I proceeded on the basis that I thought there was an agreement, but if the record isn't sufficient to support that, then that will be for another body to say. In [the] context of the question asked and the instructions given, I don't believe it is an erroneous instruction that would mislead the jury if it followed, as I believe it would follow, all instructions given and the instructions upon which they should consider matters. Consequently, I will deny the motion for a new trial.

On appeal, WPT argues that its motion for a new trial should have been granted because the answer to the jury's question was "highly prejudicial and erroneous[.]" In so arguing, WPT continues to assert that the exchange at trial about how to answer the jury's question constituted an objection. WPT also contends the answer itself was misleading to the jury because under general contract principles, an employment relationship between Hawes and Blixseth was not legally formed at the June 2005 dinner. WPT reiterates its claim that the additional employment requirements were not finalized until August 1, 2005.

Hawes argues that WPT failed to object to the district court's answer to the jury, and that even if the issue had been preserved, the jury instruction was legally correct because it captured the mutual agreement required to create an employment relationship. Hawes points out that while WPT raised objections earlier in the answer-crafting process, the ultimate answer was one sentence taken word-for-word from WPT's proposed answer. Hawes further argues that there was no indication that the employment agreement on the three essential terms of salary, severance, and Hawes' work as an ISB commissioner was contingent on employment requirements such as filling out forms.

In response, WPT continues to argue that its objection was preserved, citing "additional discussion of proposed jury instruction that was not recorded by [the] court reporter[.]" WPT cites

*Garcia v. Windley*, 144 Idaho 539, 542–43, 164 P.3d 819, 822–23 (2007), for the proposition that the mere possibility of prejudice is sufficient to merit a new trial where a jury instruction has been given erroneously.

"A party cannot raise an issue on appeal which relates to 'the giving of a jury instruction that misstates the law unless the party timely objected to the specific instruction on the record, stating the grounds of the objection.'" *Hoffer v. Shappard*, 160 Idaho 868, 875, 380 P.3d 681, 688 (2016) (quoting *Bolognese v. Forte*, 153 Idaho 857, 867 n.6, 292 P.3d 248, 258 n.6 (2012)); *see also* I.R.C.P. 51(b). "All objections to instructions proposed by the court, and any objections to the giving or the failure to give an instruction, and the court's ruling on the objection, must be made a part of the record." I.R.C.P. 51.

Based on the transcript of the discussion between counsel and the district court, WPT did not object to the answer suggested by and then provided to the jury by the district court. Despite WPT's characterization of the exchange, the sentence provided to the jury was materially identical to WPT's proposed answer. The transcript reflects that WPT's counsel stated: "What if we say: '*The legal point of employment is when the parties agree.* You must determine that point based on the concepts of contract law that have been provided to you. Because they are entering into an employment relationship and that is different than just any other relationship because you have certain obligations once you are an employee.'" (Italics added.) After further discussion, the district court asked, "So just send back: 'The legal point of employment is when the parties agree?'" In response, counsel for WPT added, "Mutually agree, yeah." Hawes' counsel chimed in: "Fine by us. May as well. We've got to get an answer, that's the only one we are going to get agreement on. I don't think it's controversial." Another discussion was held, this time off the record, after which the district court stated:

> THE COURT: On the record.
> Here's what we have. A question has been submitted by the jury: What is the legal point at which a company or entity becomes a person's employer?
> Answer: The legal point of employment is when the parties agree.
> Any objection?
> [Hawes' counsel]: We'll accept that, your Honor.
> [WPT's counsel]: Yes, your Honor.

Although WPT has claimed that this exchange was rife with its objections, even pointing to portions of this discussion held off the record, this Court assumes that what is not included in the record supports the district court's decision. *See Gibson*, 138 Idaho at 790, 69 P.3d at 1051

22

("When a party appealing an issue presents an incomplete record, this Court will presume that the absent portion supports the findings of the district court."). The transcript, such as it is, does not support WPT's assertion that an objection was made, much less that the basis for this objection was made clear to the district court. In fact, the transcript reflects WPT's agreement with the answer proposed by the district court. There is no ruling on the record based on an objection for this Court to review. *See* I.R.C.P. 51. WPT failed to object, on the record, to the answer given to the jury. As a result, there is no need to reach WPT's argument that the jury instruction was an incorrect statement of law. *See Hoffer*, 160 Idaho at 875, 380 P.3d at 688.

**F. The district court did not abuse its discretion in entering an award of attorney fees based on the trebled award of damages contained in the contingency fee agreement between Hawes and his counsel.**

1. Standard of Review.

> "An award of attorney fees and costs is within the discretion of the trial court and subject to an abuse of discretion standard of review." *Smith v. Mitton*, 140 Idaho 893, 901, 104 P.3d 367, 375 (2004). "The party disputing the award has the burden of showing an abuse of discretion." *Id.*

*Ballard*, 160 Idaho at 716, 378 P.3d at 506.

2. Discussion.

The district court entered judgment in the amount of $1,639,726.80. This reflected a trebling of the jury's award of damages based on Idaho Code section 45-615(2) and an award of prejudgment interest. At the time, the district court left attorney fees and costs to be assessed later.

Hawes then filed his memorandum of attorney fees and costs. Hawes requested his costs as of right under I.R.C.P. 54(d)(1)(C). Hawes also requested attorney fees in the amount of $573,904.38, citing Idaho Code section 45-615 and an attorney fee agreement with his counsel providing for a contingent fee of 35% of the gross recovery.[11] Hawes argued that he was entitled

---

[11] The attorney fee provision in the agreement between Hawes and his counsel states, in relevant part,

> Client agrees to pay as attorneys' fees a contingency fee of the gross amount of all sums received from any source relating to this claim and any other financial savings which inures to the benefit of client. This amount will be paid whether the recovery is made pursuant to settlement, trial or otherwise. The contingency fee will be taken from the gross recovery and the percentage will depend on when a settlement is reached or payment is received, whichever is first. If settlement is reached or payment received within 35 days of this agreement being signed, then the contingency fee will be 15% of the gross recovery. If between 36 days and 150 days, the fee will be 24% of the gross recovery. If between 151 days and 240 days, the fee will be 30% of the gross recovery. If between 241 days and 365 days, the fee will be 33 1/3% of the gross recovery. If after 365 days, the fee will be 35% of the gross recovery.

to this full amount of his contingent fee agreement with his attorneys, analyzing the eleven factors for an attorney fee award set out in Idaho Rule of Civil Procedure 54(e)(3). He accompanied his memorandum with several affidavits from area attorneys.

In response, WPT moved to disallow costs and attorney fees. WPT specifically argued that an award of attorney fees above and beyond the already-trebled award of damages would result in a windfall to Hawes and harshly punish WPT. In the alternative, WPT argued that if attorney fees were awarded, the amount Hawes had requested was not reasonable. Hawes countered, detailing the many ways WPT had attempted to avoid paying him his severance package, and arguing the reasonableness of the requested attorney fees under I.R.C.P. 54(e)(3).

When the district court entered its order on fees and costs, it analyzed the I.R.C.P. 54(e)(3) factors, concluding that a full award of Hawes' requested attorney fees was appropriate. The district court then entered its judgment for attorney fees and costs.

On appeal, WPT argues that an award of attorney fees based on the trebled damages is harsh and punitive. WPT cites to *Gomez v. MasTec North America, Inc.*, 2006 WL 8446077 (D. Idaho Dec. 13, 2006), a case from the District of Idaho in which the U.S. magistrate judge declined to award attorney fees under the statute, citing *Rodwell v. Serendipity, Inc.*, 99 Idaho 894, 895, 591 P.2d 141, 142 (1979). WPT further emphasizes the discretionary nature of attorney fees under Idaho Code section 45-615(2), citing *Maroun v. Wyreless Systems, Inc.*, 141 Idaho 604, 611, 114 P.3d 974, 981 (2005).

Hawes argues that, despite recognizing the discretionary nature of attorney fees under Idaho Code section 45-615(2), WPT failed to analyze how the award of attorney fees was an abuse of the district court's discretion. In response, WPT argues that the thrust of its challenge to the award of attorney fees is that the district court failed to consider and apply relevant case law, and only provided four pages of cursory analysis of the Rule 54(e)(3) factors.

When awarding attorney fees, a court is required to consider all of the factors listed in Idaho Rule of Civil Procedure 54(e)(3), but is not required to make specific findings as to each one. *Smith*, 140 Idaho at 902, 104 P.3d at 376 ("When considering the factors, courts need not demonstrate how they employed any of those factors in reaching an award amount."). This Court has recognized an award of contingent fees—rather than hourly—as an appropriate exercise of discretion. *See Parsons v. Mut. of Enumclaw Ins. Co.*, 143 Idaho 743, 748, 152 P.3d 614, 619 (2007) ("A contingent fee agreement that was reasonable when entered into does not become

unreasonable simply because in the end the attorney recovers more than he or she would have under an hourly fee contract.").

Idaho Code section 45-615(2) governs the award of damages and attorney fees in a statutory wage claim. The statute reads: "Any judgment rendered by a court of competent jurisdiction for the plaintiff in a suit filed pursuant to this section *may include all costs and attorney's fees* reasonably incurred in connection with the proceedings . . . [in addition to] damages in the amount of three (3) times the unpaid wages due and owing." *See* I.C. § 45-615(2) (italics added). The statute makes it clear that a successful plaintiff may recover both trebled damages and attorney fees.[12]

WPT's appeal raises an issue of first impression, as this Court has not yet examined a district court's award of attorney fees based on a contingent fee agreement where the underlying award of damages has been trebled. WPT asserts that this Court has already weighed in on an award of attorney fees based on trebled damages, citing *Rodwell v. Serendipity, Inc.*, 99 Idaho 894, 895, 591 P.2d 141, 142 (1979). *Rodwell* was a wage claim case in which this Court was asked to award attorney fees on appeal where an award of damages had already been trebled. *Id.* This Court declined to do so.

WPT relies on this case—and cases later relying on *Rodwell*[13]—for the proposition that an award of attorney fees based on a trebled award of damages would constitute an unreasonable windfall to Hawes and would be punitive to WPT. However, *Rodwell* is not binding precedent for two reasons. First, this Court in *Rodwell* was asked to award attorney fees under Idaho Code section 12-121. Since *Rodwell*, Idaho Code section 12-121 has been rejected as a basis for an award of attorney fees for wage claims. *See Polk*, 135 Idaho at 315, 17 P.3d at 259. Second, this Court was determining attorney fees *on appeal*, rather than analyzing an award of attorney fees below. *Id. Rodwell* is, therefore, an example of this Court's approach to an attorney fee request on appeal,

---

[12] A plaintiff must specifically request attorney fees under this statute in order to recover attorney fees in a statutory wage claim. *See Polk v. Larrabee*, 135 Idaho 303, 315, 17 P.3d 247, 259 (2000) (rejecting Idaho Code section 12-120(3) as a basis for recovery of attorney fees in statutory wage claims); *Schoonover v. Bonner Cnty.*, 113 Idaho 916, 923, 750 P.2d 95, 102 (1988) (rejecting I.C. section 12-121 as a basis for recovery of attorney fees in statutory wage claims); *but see Nettleton v. Canyon Outdoor Media, LLC*, 163 Idaho 70, 75, 408 P.3d 68, 73 (2017) (noting that breach of employment contract actions—as opposed to statutory wage claim actions—are considered commercial transactions under Idaho Code section 12-120(3) such that attorney fees can be awarded).

[13] In particular, WPT cites a U.S. District Court case for the District of Idaho, *Gomez v. MasTec N. Am., Inc.*, 2006 WL 8446077 (D. Idaho Dec. 13, 2006), which the U.S. magistrate judge cited *Rodwell* in declining to award attorney fees after trebling an award of damages in a wage claim case. There, the magistrate judge recognized his discretion in declining to award attorney fees. *See Gomez*, 2006 WL 8446077, at *5.

rather than part of the legal analysis applicable to a lower court's determination of the appropriateness of attorney fees.

More to the point, however, Idaho's wage claim act *can be* punitive in nature to the extent that it was designed to deter bad behavior on the part of an employer. As written, the statutes authorizing wage claim suits provide an incentive to employers to deal fairly with their employees, given the uneven bargaining positions between the two. As we explained in *Lawless v. Davis*, 98 Idaho 175, 177, 560 P.2d 497, 499 (1977), the earliest incarnation of a wage claim suit only allowed an "employee to collect without working, the amount of his daily wage for each day that his employer allow[ed] to pass without settling the outstanding wage claim. The section allow[ed] a maximum recovery of thirty days [now fifteen days] additional wages."[14] However, "if the outstanding wages were of a substantial amount the threat of the employee filing suit to extract an additional thirty days wages from the employer often would not be sufficient to induce the employer to settle his account amicably." *Id.* The 1967 amendments to the wage claim statutes provided an alternative remedy for employees who were owed significantly more than the amount of thirty days' wages. *See id.*; *see also* 1967 Idaho Sess. Laws, ch. 436, § 6. In other words, the remedy of trebled damages is designed to deter the very scenario the jury found to have occurred, circumstances under which the district court commented: "There were no reasonable offers of settlement in this case. The plaintiff was offered a scrap and threatened with attacks on his honesty and integrity. If he did not accept the nuisance value offer, there was no real alternative but to go to trial."

We conclude that under this Court's abuse of discretion standard, the district court's award of attorney fees did not constitute an abuse of discretion. First, the district court explicitly recognized its discretion in making the decision, acknowledging that there might be instances where trebling attorney fees would not be appropriate. Second, the district court's decision is within the boundaries of its discretion, given this Court's treatment of contingent fee agreements. *See Parsons*, 143 Idaho at 748, 152 P.3d at 719. Third, the district court's decision is consistent with the legal standards applicable to an award of attorney fees, as shown by the district court's analysis of the I.R.C.P. 54(e)(3) factors. Finally, the district court's analysis reflects an exercise of

---

[14] This alternative remedy is now codified at Idaho Code section 45-607; in 1999, the amount of wages under this section was decreased from thirty days' wages to fifteen days' wages. *See* I.C. § 45-607; *see also* 1999 Idaho Sess. Laws, ch. 51, § 8.

26

reasoning. The district court considered the affidavits and attachments presented by Hawes and his counsel, and then spent four pages analyzing the I.R.C.P. 54(e)(3) factors and explaining its decision. This analysis concluded in the district court's decision that it was appropriate in this case to award Hawes the attorney fees requested. The district court did not abuse its discretion in awarding Hawes his contractually agreed-upon attorney fees. Consequently, we affirm the district court's decision to award Hawes his requested attorney fees.

## G. Costs, but not attorney fees, are awarded on appeal.

Hawes has requested attorney fees on appeal, citing Idaho Code section 45-615(2) and Idaho Code section 12-121. Hawes contends that the thrust of WPT's appeal asks this Court to second-guess the jury verdict. WPT counters asserting that its appeal raised good faith arguments about novel legal issues, in particular the appropriateness of a contingency fee award based on trebled damages, and the sufficiency of a jury verdict where a significant portion of evidence about an oral agreement was arguably hearsay.

"Any party seeking attorney fees on appeal must assert such a claim as an issue presented on appeal in the first appellate brief filed by such party[.]" I.A.R. 41(a). "[A]s a general rule, attorney fees are not awarded on appeal except pursuant to 'a statute or contractual provision authorizing an award of attorney fees on appeal.'" *Int'l Real Estate Sols., Inc. v. Arave*, 157 Idaho 816, 822, 340 P.3d 465, 471 (2014) (quoting *Ticor Title Co. v. Stanion*, 144 Idaho 119, 127, 157 P.3d 613, 621 (2007)). In addition, we have previously held the exclusive statutory basis for awarding a plaintiff attorney fees in a wage claim case is Idaho Code section 45-615. *See Polk*, 135 Idaho at 315, 17 P.3d at 259.

Because the judgment of the district court is affirmed, Hawes is the prevailing party. However, we decline to award additional attorney fees on appeal. First, Idaho Code section 12-121 is not a basis for granting such an award here. *See Schoonover*, 113 Idaho at 923, 750 P.2d at 102. We also decline to award attorney fees on appeal under Idaho Code section 45-615(2) because given the district court's resolution of this case, Hawes will receive all that he has contracted for with his attorneys. It was conceded by Hawes' counsel during oral argument that the attorney fee agreement created a maximum recovery of 35% even if the case were to be resolved on appeal. As a result of the agreement, Hawes has incurred no additional attorney fees on appeal. We applaud Hawes' counsel for his candor on this question. However, given that the gravamen of this decision is to uphold an award to Hawes of all his contractually agreed-upon attorney fees, an award of

attorney fees on appeal would result in a revision of Hawes' contract with his lawyers. We decline to award more attorney fees than the contract allows. Consequently, Hawes' request for an award of additional attorney fees on appeal is denied.

Costs are awarded to Hawes as of right under Idaho Appellate Rule 40.

### III.    CONCLUSION

For the foregoing reasons, this Court affirms the judgment of the district court. First, the district court did not err in denying WPT's motion for a directed verdict. Second, substantial and competent evidence supports the jury's special verdict. Third, the district court did not abuse its discretion in allowing Hawes to testify regarding Blixseth's statements under I.R.E. 801(d)(2)(D). Fourth, this Court affirms the district court's decision to deny a new trial because WPT failed to properly preserve an objection regarding the jury instruction. Fifth, the district court did not abuse its discretion in awarding attorney fees based on Idaho Code section 45-615(2) and Hawes' contract with his attorneys, as a percentage of the trebled damages. Finally, this Court declines to award attorney fees on appeal, but awards Hawes his costs on appeal.

Chief Justice BURDICK, Justices BEVAN, MOELLER and HORTON, J. Pro Tem, CONCUR.